266 N.J. Super. 300 (1991)
629 A.2d 895
MORTON INTERNATIONAL, INC., SUCCESSOR TO MORTON THIOKOL, INC., NOW NAMED THIOKOL CORPORATION, PLAINTIFF-APPELLANT, CROSS-RESPONDENT,
v.
GENERAL ACCIDENT INSURANCE COMPANY OF AMERICA, DEFENDANT-RESPONDENT, CROSS-APPELLANT, AND LIBERTY MUTUAL INSURANCE COMPANY, AFFILIATED FM INSURANCE COMPANY, AMERICAN HOME ASSURANCE COMPANY, CONTINENTAL CASUALTY COMPANY, FIRST STATE INSURANCE COMPANY, INSURANCE COMPANY OF NORTH AMERICA, UNDERWRITERS AT LLOYDS, LONDON, DEFENDANTS-RESPONDENTS, AND AETNA CASUALTY & SURETY COMPANY, ET AL., DEFENDANTS.
Superior Court of New Jersey, Appellate Division.
Argued May 30, 1991.
Decided October 2, 1991.
*303 Before Judges KING, R.S. COHEN and STERN.
George F. Kugler argued the cause for appellant Morton International Inc. (Archer & Greiner, attorneys; Thomas C. Hill, Taft, *304 Stettinuis & Hollister, of counsel; Edward C. Laird and Deborah H. Simon on the brief).
Elliott Abrutyn, argued the cause for respondent General Accident Insurance Company of America (Morgan, Melhuish, Monaghan, Arvidson, Abrutyn & Lisowski, attorneys; Timothy Saia, on the brief).
John G. McAndrews argued the cause for Certain Underwriters at Lloyds and Certain London Market Insurance Companies (Ronca, McDonald & Hanley, attorneys; Mr. McAndrews and Henry Lee, Kathleen B. Browne, Nancy N. Sipp, Mendes & Mount of the New York Bar, of counsel and on the brief).
William S. Wachenfeld argued the cause for defendant-respondent, Affiliated FM Insurance Company (Priestley, McGuirl & Wachenfeld, attorneys; Siff, Rosen & Parker, and DeCotiis & Pinto, attorneys for respondent, First State Insurance Company; Louis G. Adolfsen and James A. Farber, on the joint brief).
Charles W. Miller, III, argued the cause for respondent American Home Assurance Company (Golden, Rothschild, Spagnola & DiFazio, attorneys).
Paul R. Koepff argued the cause for respondent Insurance Company of North America (Mudge, Rose, Guthrie, Alexander & Ferdon, attorneys).
John C. Sullivan argued the cause for respondent Liberty Mutual Insurance Company (Manta and Welge, attorneys).
Smith, Stratton, Wise, Heher & Brennan, counsel for Amicus Curiae Insurance Environmental Litigation Association (Thomas W. Brunner, Marilyn E. Kerst, Carol Barthel, Wiley, Rein & Fielding, of counsel; Wendy L. Mager on the brief).
Haskell & Perrin, and Chasan, Leyner, Tarrant, Loftis & Lamparello, attorneys for respondent Continental Casualty Company (James Kirk Perrin, Daniel P. Caswell, Marsha Kay Ross, of counsel and on the brief).
The opinion of the court was delivered by KING, P.J.A.D.
*305 This case is another episode in a long history of litigation which began in 1976 when the State Department of Environmental Protection (DEP) instituted suit against Ventron Corporation, and others, alleging that a mercury processing facility located on its premises was polluting Berry's Creek in Bergen County. The DEP prevailed and Ventron was held strictly liable for clean-up costs in a decision affirmed by the this court and affirmed, as modified, by the Supreme Court. DEP v. Ventron, 182 N.J. Super. 210, 440 A.2d 455 (App.Div. 1981), aff'd as modified, 94 N.J. 473, 468 A.2d 150 (1983). Subsequent purchasers of the contaminated property, Robert and Rita Wolf (the Wolfs), were successful in their crossclaim in that litigation and obtained a judgment because Ventron was guilty of fraudulent nondisclosure of the property's polluted condition. See 94 N.J. at 503-504, 468 A.2d 150.
The nominal plaintiff here, Morton International, Inc., (Morton or plaintiff) is the successor by acquisition to the rights of Ventron. When the Ventron complaint first was filed, all of the insurers of the owners of the contaminated property disclaimed coverage and refused to defend the action. After the Supreme Court's decision in 1983, Morton filed this declaratory judgment action in the Chancery Division seeking indemnity for remediation expenses and recoupment of the costs incurred in defending the suit brought by the DEP and the crossclaim asserted by the Wolfs. Twenty-one insurance companies were named in this declaratory judgment action. Partial summary judgment was granted to all defendants with respect to their obligation to defend and indemnify Morton on the crossclaim by the Wolfs. Cross-motions for summary judgment on the remaining issues were filed by plaintiff and the defendants which resulted in a ruling that only General Accident Insurance Company of America (General Accident) was liable and only for part of Morton's costs in defending the DEP suit but that no defendant had a duty to indemnify Morton with respect to the claims made in the Ventron case. *306 Judge Huot, the Law Division judge who granted the summary judgment, ordered a trial to establish the reasonable costs due for defense of the Ventron case. A trial was held before Judge Lesemann, and Morton was awarded judgment against General Accident for part of the Ventron case defense costs ($100,420.07) and attorneys' fees ($40,000) for successfully prosecuting the "cost of defense" trial. See R. 4:42-9(a)(6). The full costs of defense of the Ventron case were in excess of $1 million. Costs of remediation of environmental damage are yet undetermined.
Morton now appeals from the ruling dismissing its indemnity claims and from the claimed inadequate amount of the cost of the defense award contending that: (1) genuine issues of material fact were in dispute; (2) the judge erred in deciding as a matter of law and fact that the damages resulting from the mercury contamination were not caused by "an accident" within the meaning of the insurance policies; (3) the judge improperly construed the record and the law with respect to "occurrence" as defined in the insurance policies; (4) damage resulting from a covered "occurrence" took place after the plant closed; (5) the judge erroneously failed to order reimbursement of the full cost of defending the Ventron action and (6) the court abused its discretion in restricting the scope of discovery. General Accident's cross-appeal challenges Judge Huot's determination that it had any duty to defend Morton in the Ventron action.
On appeal from the rulings on the motions and cross-motion for summary judgment, R. 4:46-2, we affirm the judgment concluding that the insurers had no duty to indemnify Morton. We reverse that part of the judgment which concludes that General Accident had a partial duty to defend Morton and we vacate the award of counsel fees in Morton's favor.
The facts pertinent to decision were presented in various forms to Judge Huot on the cross-motions for summary judgment. This included portions of the trial testimony and documentary evidence presented at the initial liability trial, DEP v. Ventron, before Judge Lester. Documents relevant to the various coverages were *307 before Judge Huot and were not in dispute. The focus of the dispute in the Chancery Division was the inferences and conclusions to be drawn from these facts in the stipulated record. This suit was brought by Morton in the Chancery Division without a demand for a jury. Under the circumstances we see no practical difference between an adjudication at a bench trial or on this stipulated record on cross-motions for summary judgment. The decision was essentially a legal one for the judge.
This is the pertinent information about the insurance coverage. General Accident, Reserve and Liberty Mutual provided primary general liability insurance coverage for plaintiff between 1961 and 1976. General Accident insured plaintiff for the longest period of time, between 1961 and 1972. Reserve insured plaintiff for about the next two years; Liberty Mutual, for about one year. The remaining defendant insurance companies (London Market, American Home, Continental Casualty, INA, First State and FM Affiliated) provided excess coverage.
Although Judge Huot's opinion states that, chronologically, the first primary policy was issued by General Accident in 1964, the insurance coverage chart supplied by plaintiff in its appendix indicates that Continental Casualty actually provided the first primary coverage in 1960 and General Accident began its primary coverage in the last quarter of 1960 to the last quarter of 1971. Due to General Accident's long-term primary coverage, the focus of the judge's opinion was on the provisions of General Accident's policy.
As noted by Judge Huot, neither General Accident nor Morton was able to produce either the original or a copy of the insurance contract in existence at that time. Rather, sample policy forms were submitted and accepted by all parties as accurate for purposes of the cross-motions for summary judgment. A form dated "7/64" indicated that with respect to property damage liability, except involving an automobile, General Accident agreed "to pay on behalf of the insured all sums which the insured shall become legally obligated to pay ... because of injury to or destruction of *308 property ... caused by accident." The coverage applied only to "occurrences or accidents" which happened during the policy period and required that written notice be given to the company "as soon as practicable ... in the event of an accident or occurrence." Similarly, the insured was required to "immediately forward to the company" any process served upon the insured if a claim was brought or suit was instituted. The policy, however, did not define the term "accident."
In subsequent policies, at least after 1964, the policy language was amended to delete the phrase "caused by accident" in that section which defined the company's non-automobile property damage liability and to substitute the words "resulting from an occurrence." An occurrence was then defined as
... An unexpected event or happening which results in injury to or destruction of tangible property during the policy period, or a continuous and repeated exposure to conditions which result in injury to or destruction of tangible property during the policy period, provided the insured did not intend or anticipate that injury to or destruction of property would result. All damages arising out of such exposure to substantially the same general conditions shall be considered as arising out of one occurrence.
By 1966 occurrence had a new definition. The term was defined to mean
... An accident, including injurious exposure to conditions, which results, during the policy period, in bodily injury or property damage neither expected nor intended from the standpoint of the insured.
General Accident's description of the scope of its liability and definition of occurrence is substantially the same as those set out in the other excess policies covering plaintiff during the pertinent time period. Likewise, all of the insurance policies imposed upon plaintiff the duty to provide written notice in the event of an accident or an occurrence "as soon as practicable." Although General Accident's policy did not, several of the defendant insurers' policies contained pollution exclusions which would not provide coverage for bodily injury or property damage arising out of contamination or pollution unless it was the result of an accident.
By letter dated April 15, 1976 plaintiff directed its insurance broker, Marsh & McLennan, Inc., to notify all of its insurers that *309 it had been served with the complaint and crossclaim. Relying upon the pollution exclusions in its policies covering plaintiff, Affiliated F.M. denied coverage. Five days later Liberty Mutual denied coverage, relying on its pollution exclusion and maintaining that no covered occurrence had taken place. On June 3, 1976 Reserve denied coverage asserting that no covered occurrence took place, and relied on the existence of the pollution exclusion and an exclusion for liability based upon a willful violation of public law. General Accident denied coverage by letter dated April 12, 1977 on the grounds that the claim did not fall within the policy definition of either occurrence or property damage. In May 1979 Reserve was declared insolvent and ordered liquidated by an Illinois court.
This is the factual background. F.W. Berk & Co. (Berk) owned and operated a mercury processing plant from 1929 to 1960 on a 40-acre tract west of Berry's Creek in Bergen County. During that time Berk dumped untreated waste material on the property resulting in mercury-laden effluent draining on the tract. DEP v. Ventron, supra, 94 N.J. at 483, 468 A.2d 150. Velsicol Chemical Corporation (Velsicol) formed and capitalized Wood Ridge Chemical Corporation (Wood Ridge) as its wholly-owned subsidiary in 1960. Wood Ridge then purchased Berk's assets, including the 40-acre tract. From 1960 to 1974 Wood Ridge operated the mercury processing plant. In 1967 Wood Ridge declared a land dividend of 33 acres, subdivided from the 40-acre tract, to its parent corporation, Velsicol. DEP v. Ventron Corp., supra, 182 N.J. Super. at 217, 440 A.2d 455. Velsicol continued to permit Wood Ridge to dump untreated waste material on the 33-acre tract. 94 N.J. at 484, 468 A.2d 150. Velsicol remained the owner of the 33-acre tract. In 1968, however, it sold all the capital stock of Wood Ridge to Ventron Corporation (Ventron). 182 N.J. Super. at 217, 440 A.2d 455. After Ventron acquired the plant, it began to consider a program of treatment for plant wastes. Up to that point, the waste routinely coursed over the land through open drainage ditches. In March 1968, Ventron hired the firm of Metcalf & Eddy to study the effects of mercury on the land. *310 Three months later Ventron constructed a weir to aid in monitoring the effluent. 94 N.J. at 484, 468 A.2d 150.
The DEP monitoring of the effluent started in the mid-1960s. At that time the DEP took no action against Wood Ridge. In 1970, however, the contamination at Berry's Creek came to the attention of the United States Environmental Protection Agency (EPA) which tested Wood Ridge's waste water. The tests showed that the effluent deposited at least two to four pounds of mercury into Berry's Creek each day. Later in 1970, Wood Ridge installed a waste treatment system that abated, but did not completely halt, the flow of mercury into the creek. The plant continued to operate until 1974 when Wood Ridge merged into Ventron. Ventron then terminated the plant operations and sold the movable operating assets to Troy Chemical Company, an entity not involved in these proceedings. Id. at 484-485, 468 A.2d 150.
In February 1974 Wood Ridge gave a commercial real estate developer, Robert Wolf, an option to purchase the 7.1-acre tract on which the plant was located. In May of 1974 Ventron conveyed the tract to the Robert and Rita Wolf. The Wolfs planned to demolish the plant and construct a warehousing facility. In the course of the demolition, the mercury-contaminated water was used to wet down the structures and was allowed to run into the creek. When the DEP became aware of the situation, it ordered the demolition to stop, pending adequate removal or containment of the contamination. The Wolfs implemented a containment plan other than the one proposed by the DEP and proceeded with the project, ultimately constructing the warehouses. Id. at 485, 468 A.2d 150. The DEP instituted suit in March 1976. Ibid.
After a 55-day trial before Judge Lester, the defendants Berk, Wood Ridge, Velsicol and Ventron were held liable for damages caused by the creation of a public nuisance and the conduct of an abnormally dangerous activity. Ventron was also held liable to the Wolfs for fraudulently concealing material facts with respect to the pollution of the property it had sold to them  determinations *311 later upheld by our Supreme Court. Id. at 493, 504, 468 A.2d 150.
The Supreme Court summarized this routine discharge of toxic chemicals at the site by Morton's predecessors over five decades in this way:
Beneath its surface, the tract is saturated by an estimated 268 tons of toxic waste, primarily mercury. For a stretch of several thousand feet, the concentration of mercury in Berry's Creek is the highest found in fresh water sediments in the world. The waters of the creek are contaminated by the compound methyl mercury, which continues to be released as the mercury interacts with other elements. Due to depleted oxygen levels, fish no longer inhabit Berry's Creek, but are present only when swept in by the tide and, thus, irreversibly toxified.
The contamination at Berry's Creek results from mercury processing operations carried on at the site for almost fifty years. [94 N.J. at 481-482, 468 A.2d 150].
The record before Judge Huot demonstrated that as early as 1956 plaintiff's predecessor was informed that the effluent from the mercury processing plant contained an unacceptable level of pollutants. A report filed by two senior State Health Department public health engineers on April 9, 1956 detailed the results of their inspection of the property. These inspectors found that the plant consumed 60,000 gallons of water per day, about 90% of which was used for cooling purposes. Industrial wastes were produced from three buildings and consisted mostly of cooling water which had a high solid content, mainly insoluble dimethylcithiocarbonates which are organic and inorganic mercury compounds. The waste passed through a sedimentation tank from which the settled solids were recovered and reprocessed. The effluents from the settling tanks combined into a private sewer which discharged into an open ditch about 1200 feet from the plant, which in turn discharged the effluent into Berry's Creek at a point 2500 feet from the plant. Both public health engineers concluded that the combined effluent from the plant had an unacceptably high level of suspended solids and that the settling tank serving the effluent from one of the buildings was not large enough.
On December 2, 1958 one of the public health engineers, John Wilford, again visited the property "to ascertain the current status *312 of their program for the treatment or disposal of their industrial wastes in order to eliminate pollution of Berry's Creek." He reported that the company had not been successful in persuading the Wood-Ridge Sewage Treatment Plant to accept plaintiff's wastes. Wilford made an inquiry about having a large settling tank constructed with an outfall to Berry's Creek. Nothing about the processing at the plant had changed. Wilford explained to the company's vice-president that a settling tank would not, itself, reduce the pollution to acceptable limits and that if the company intended to continue discharging effluent into Berry's Creek it would have to submit plans and specifications to the Department of Health for approval. Wilford admonished the corporate official "that as this matter has been brought to [his] attention over two years ago, this department has a right to expect some appreciable progress toward the elimination of this problem." A four-point course of action was outlined to the company to which its vice-president agreed to comply. By March 17, 1959, however, it was clear to Wilford the company had made no progress "toward eliminating the polluting industrial waste therefrom from Berry's Creek." According to Wilford, the company was "cognizant" that its wastes contained mercury compounds which had to be removed.
In September 1959 and again in February 1960 Edward Griche, Inc. conducted an investigation into the nature of the waste emitted by the plant and the type of treatment which would clean the effluent. Both reports showed that the effluent from the processing plant contained many "deleterious characteristics" which included high suspended solids concentration. The report explored several treatment methods, some of which had proven to be highly successful and relatively cheap.
The State Department of Health again inspected the premises on February 4, 1960 taking samples of the industrial waste effluent for the purpose of determining "the current pollutional potential of the wastes." The written report which issued after that inspection showed that the "pollutional aspect" of the company's *313 wastes first came to the attention of the State Department of Health in 1956. Although the report indicates that the company was "very cooperative" and "desirous of rectifying the present pollution," it had yet to decide what type of treatment facility to install and was unable to negotiate for waste disposal with the Borough of Wood-Ridge. Samples of the effluent were taken from three buildings on the premises with a report noting that "no treatment as such is afforded the industrial wastes." The conclusion of this report, as in an earlier report, stated "the combined industrial wastes effluent from S.W. Berk & Company is unacceptable for discharge into Berry's Creek." The report warned that the decision as to the type of waste treatment to be effected had been under consideration for several years; the author threatened legal action to secure compliance with the pertinent statutes.
By March 22, 1960 the company knew that the municipal sewerage system would not be able to handle its wastes, even with pretreatment. A letter from the company to the Department of Health indicated, however, that the company was seeking "professional help on design of a treatment plant." By May 1960 it appeared that Velsicol would purchase Berk's property and assets. Velsicol was informed of the State Department of Health's inspection report of February 1960 and was told that Berk had been "planning to make certain installations to reduce the amount of pollution resulting from its operations...." The sale was completed and the company's name changed to Wood-Ridge Chemical Corporation in July 1960. The State Department of Health again inspected the premises in August 1960 and issued a written report which noted that, despite the name change, "the official personnel remain the same as do also the chief production processes." At the time of this inspection, however, the plant was closed with full production expected to resume by October. Consequently, no sampling of waste was possible and the report merely noted that all production units produced wastes which flowed through a series of settling basins and united in a common ditch leading to Berry's Creek just below the outfall of the Wood-Ridge Sewerage Treatment Plant. Settling was the only treatment of the waste *314 provided and it was observed that some of the settling basins were in need of cleaning. Again, the company represented to department officials that it was "now planning to construct its own treatment devices."
The plant was again inspected on December 5, 1960. The department's analysis of the plant's effluents indicated "a deleterious waste due chiefly to its high turbidity, suspended solids and ether soluble content." The effluent sample taken during the December 1960 visit was removed from a 5-foot deep, 40-foot square lagoon which had recently been excavated behind the industrial property. That lagoon received all the industrial waste effluents from the plant buildings and acted as an additional settling tank with an average detention period of about two days. The lagoon effluent emptied into Berry's Creek through an underground storm drain pipe. The report concluded with the suggestion that the company proceed with its plans to install additional waste treatment equipment on the premises in order to provide a nonpolluting final effluent.
In February 1964 the State's supervising engineer for the stream pollution control program wrote to the corporation's vice-president observing that a year prior the company informed the State Department of Health that it had contracted with consulting engineers to design suitable industrial waste treatment facilities to treat the lagoon effluent. The State complained that it received no engineering studies or proposals with respect to treatment facilities. Cautioning that the lagoon was nothing more than a temporary or preliminary step leading to treatability studies on the plant's effluents, Wood-Ridge Chemical was directed to advise the State of its treatment program status and when completion of a satisfactory facility would occur. In response, the company forwarded a "report on industrial waste treatment facilities, Wood-Ridge Chemical Corporation," authored by Clinton Bogert Associates, Consulting Engineers. Representatives from the company met with State Board of Health officials on August 5, 1964. At that time they reached an agreement in which the company *315 was immediately to authorize final planning of new plant sewers and facilities for the collection and treatment of industrial wastes and to submit them to the department for approval within the next several weeks. These treatment facilities would be similar in general design to those recommended by the Clinton Bogert report. The effluent quality standards listed in the Bogert report would be adhered to as minimum requirements before the effluent was discharged into Berry's Creek and the existing waste-holding lagoon would be abandoned after completion and operation of the waste treatment facilities. This agreement was memorialized in a letter from the bureau to the company dated August 6, 1964.
By letter dated November 2, 1964 Wood Ridge reported to the Department of Health about its progress on the waste treatment facility. Wood Ridge promised that construction of a tile sewer and collecting sump for separation of process wastes would be completed by the end of November, after which further laboratory work would be done on the effluent and final plans for the treatment plant could be completed by March 31, 1965. The department responded by seeking greater haste on the company's part and indicating the hope that an adequate design and construction of a treatment project would be completed within the next few months so that "the source of pollution to Berry's Creek may be finally abated." By January 25, 1965 the Department of Health had apparently not received any information about the laboratory studies which were to accompany final installation of the sewers and collecting sump and sought additional information about the progress of the project. Apparently the sewer and collecting sump were completed on January 15, 1965. Wood Ridge planned to have the laboratory studies complete by March, with the planned treatment facilities "on stream by July 1965." In June 1965, however, the health department had received no reports on the laboratory studies or the design of the waste treatment facilities. Even by March 31, 1966 no treatment plant had been designed, let alone completed, at the site.
*316 By late 1969 or early 1970 the federal Environmental Protection Agency became involved in the company's waste problems. John Ciancia, Chief of the Industrial Waste Section of the Federal Water Quality Administration, visited the site and determined that it was discharging process waste containing mercury. On October 23, 1970 the company approved a capital expenditure for improved effluent treatment  a problem characterized by a company document as "currently at an emergency level." That document asserted that
We are discharging mercury at a rate which we cannot measure precisely, but which has been estimated by the F.W.Q.A. [Federal Water Quality Administration] at 4.2 lbs./day (55 GPM total discharge, averaged over 24 hours, 7 PPM mercury content). The preliminary standard which the F.W.Q.A. appears to be accepting from other mercury users is a maximum of 0.5 lbs./day, which we definitely exceed.... Ventron has already suffered adverse publicity because of alleged mercury discharges, and we will certainly receive more if we do not institute controls approved by the F.W.Q.A. While the current furor over mercury pollution undoubtedly contains much exaggeration and misinformation, it is unquestionably a toxic substance, and as such we are under a moral obligation, as well as an impending legal one, to effectively control the mercury effluent from our processes.
From subsequent correspondence between the federal agency and Ventron (by then, 1971, owner of the processing plant), we deduce that the parties were attempting to work out the details of a new treatment process to reduce the amount of mercury admittedly being deposited into Berry's Creek. Ventron never succeeded in preventing mercury contaminated effluent from reaching Berry's Creek. As noted, the processing plant tract was sold to the Wolfs in 1974 and their development of the property caused additional pollution problems which resulted in the suit filed by the DEP.
In March 1976 the DEP filed the complaint against Ventron, Wood Ridge, Velsicol, Berk and the Wolfs charging violation of the New Jersey Water Quality Improvement Act of 1971, N.J.S.A. 58:10-23.1, to -23.10; L. 1971, c. 173, and with creation and maintenance of a nuisance. As noted, after the 55-day trial, Judge Lester held Berk and Woodridge directly liable for the cleanup and removal of the mercury; held Velsicol and Ventron severally liable for half of the costs; held that the Wolfs were not liable; and, although the Spill Compensation and Control Act (N.J.S.A. *317 58:10-23.11 to 23.11c, L. 1976, c. 141) did not apply retroactively, held that monies from the spill compensation fund should be made available for the cleanup. The Wolfs obtained judgment in their favor on their crossclaim against Ventron for fraudulent nondisclosure of mercury pollution in the sale of part of the tract, which judgment included costs and counsel fees incurred by the Wolfs in their defense of the DEP action. We essentially affirmed the judgment but modified in a number of respects, including the imposition of joint and several liability on Ventron and Velsicol for all costs incurred in the cleanup and removal of mercury pollution in Berry's Creek. We precluded payments from the spill compensation fund if other sources were available to pay for the cleanup and approved future monitoring of Berry's Creek at the expense of Velsicol and Ventron. Id. at 483, 468 A.2d 150. The Supreme Court affirmed the judgment of this court, modifying it only as to the counsel fee award to the Wolfs. Id. at 505, 468 A.2d 150.
In July 1985 Morton, the successor to Ventron, filed this complaint seeking a declaratory judgment that each of the insurance company defendants was obligated under their respective policies to provide indemnification and a complete defense on the DEP's suit. Judge Huot found that none of the defendant insurance companies had an obligation to indemnify Morton because Morton's predecessors' conduct in polluting the property did not come within the scope of coverage of the policies with respect to accidents or occurrences. He found the dumping of the mercury-laden effluent on the property neither an unexpected or unintentional misfortune (an accident) nor something unintended or unanticipated by the insured. Judge Huot found "ample demonstrative evidence" to establish that Wood Ridge, and therefore Morton, knew that the property was being polluted as far back as 1956. Thus, according to Judge Huot, "[t]he only available conclusion is that with that knowledge, Wood Ridge realized, foresaw and anticipated, indeed, it knew that it was causing injury to the property and to Berry's Creek." The judge rejected plaintiff's claim that its predecessors did not intend to pollute pointing to its knowledge of the consequences of the acts of dumping hazardous *318 substances onto the property. He specifically found that the pollution was "by design" and the dumping of mercury was intentional. He confirmed the previous conclusion of our Supreme Court that all defendants in the Ventron case knew of the dangers of mercury. Judge Huot declined to accept Judge Lester's finding that Morton's predecessors did not intend to pollute Berry's Creek, concluding that this portion of Judge Lester's opinion was dicta and not binding upon him.
General Accident was held liable for the costs of defending the first count in the complaint only, which count alleged that mercury and other hazardous substances leaked, dripped, spilled and discharged into Berry's Creek. Judge Huot so concluded because there was no allegation in this count that the conduct was deliberate or intentional. He thought that this count thus gave rise to a duty on the part of General Accident to defend.
Judge Huot also decided several other issues raised on the motions for summary judgment even though he acknowledged it unnecessary to rule on them given his ultimate resolution of these motions. He rejected the insurance company's claim that cleanup costs do not constitute property damage but are equitable matters which fall outside of an insurance policy. Relying upon the Law Division's unpublished decision in Broadwell Realty Services Inc. v. Fidelity & Casualty Co., 218 N.J. Super. 516, 528 A.2d 76 (App.Div. 1987), then pending in this court, he concluded that cleanup costs which include adjacent lands and waters constituted property damage within the meaning of general liability policies.
Without squarely deciding the issue, the judge also concluded that, since no occurrence or accident took place within the meaning of the insurance policies, given plaintiff's intent to pollute, the pollution exclusions would apply. Furthermore, because there was no occurrence, the fact that the damage to Berry's Creek continued through various policy periods did not trigger serial coverage under these policies. The judge also rejected the carriers' arguments for noncoverage based upon their claims of late *319 notice. He found that no carrier had demonstrated prejudice by its receipt of late notice of the claim.
Subsequently, on March 20, 1989, Judge Lesemann issued a written decision on General Accident's liability for the cost of defense on the first count of the complaint. Although Judge Lesemann questioned the propriety of determining that General Accident had a duty to defend to any extent when it had no duty to indemnify, he refused to entertain reargument of that question which had been decided by Judge Huot. Judge Lesemann ruled that General Accident's duty to provide a defense to Morton in the DEP action did not extend beyond November 15, 1979, the date on which Judge Lester entered judgment adverse to the insured. He concluded that at this point the facts had been fixed and the claim had been confined to a recovery which the policy did not cover. He also found that Morton bore the burden of allocating the costs between the DEP claim and those incurred defending the Wolf crossclaim. The final sum of $100,429.07 was General Accident's obligation to Morton in allocated defense costs, plus $40,000 in attorney's fees in the pursuing present action. See R. 4:42-9(a)(6).

I
Morton contends that the judge erred in granting summary judgment to the carriers because there were "genuine issues of fact in dispute." Both sides had moved for summary judgment. Morton's argument focuses only on one allegedly disputed factual issue: Whether plaintiff's predecessors intended to pollute Berry's Creek. Pointing to language in Judge Huot's opinion, plaintiff maintains that the judge was acting as a "factfinder," in violation of the standard governing determination of motions for summary judgment. As evidence that a genuine issue of material fact existed concerning plaintiff's intent to pollute, plaintiff points to Judge Lester's conclusion during the liability trial that plaintiff's predecessor, Wood Ridge Chemical, allegedly did not intend to pollute the creek. Plaintiff argues that the record provides "substantial evidence" of a reasonable dispute about Wood Ridge's *320 intent to pollute the environment. General Accident asserts that the undisputed facts show plaintiff's predecessors knew they were polluting Berry's Creek and plaintiff's self-serving affidavit claiming no intention to pollute could not create a factual issue where one did not otherwise exist.
Cases are not routinely resolved by way of summary judgment. Summary judgment is a stringent remedy "granted with extreme caution. The moving papers and pleadings are to be considered most favorably to the party opposing the motion. All doubts are to be resolved against the movant." Ruvolo v. Am. Casualty Co., 39 N.J. 490, 499, 189 A.2d 204 (1963). The opposing party, however, is obligated to provide affidavits or other matters in opposition which are material, of a substantial nature, and more than a mere scintilla in order to show the existence of an issue of material fact. Judson v. Peoples Bank & Trust Co. of Westfield, 17 N.J. 67, 75, 110 A.2d 24 (1954).
Courts heed the admonition that "issues of credibility are ordinarily for the trier of fact, and the judge does not function as a trier of fact in determining the motion for summary judgment." Ibid. Equally pertinent is the principle that "in any case where the subjective elements of willfulness, intent or good faith of the moving party are material to the claim or defense of the opposing party, a conclusion from papers alone that palpably there exists no genuine issue of material fact will ordinarily be very difficult to sustain." Id. at 76, 110 A.2d 24; Exxon Corp. v. Wagner, 154 N.J. Super. 538, 541, 382 A.2d 45 (App.Div. 1977).
Plaintiff charges Judge Huot with improperly acting as a factfinder on this summary judgment motion with respect to the issue of intent, pointing to a statement in the judge's opinion where he said that "the factfinder must infer a state of mind from the words and conduct of the party...." We discern that at this point in his opinion Judge Huot was not referring to himself as a factfinder. Instead, he was noting that since the insurance provisions under scrutiny required analysis of the insured's intentions and expectations, the case involved a "subjective state of mind." The judge *321 concluded that in determining state of mind, particularly where the insured is a corporation and the focus is on a responsible corporate officer, self-serving, noncontemporaneous statements of denial of intent are not necessarily controlling or even persuasive on the motion. The judge then correctly noted that "in all matters wherein a subjective state of mind is an element of responsibility, the factfinder must infer a state of mind from the words and conduct of the party at the time of the event and such other demonstrative evidence as is available." Judge Huot ultimately found with respect to intent "that the deliberate dumping of toxic mercury onto the land, while possessed of that knowledge [of the dangers of mercury and pollution of the creek], constitutes an intent to injure that property as a matter of law." Plaintiff disagrees with this legal conclusion and asserts that this is improper factfinding by a judge on a motion for summary judgment.
We first consider another aspect of plaintiff's contention under this point, that is, the binding effect of Judge Lester's prior finding after trial in the DEP case of no intent to pollute. Without using the term, plaintiff suggests that Judge Huot was collaterally estopped from finding that plaintiff intended to injure either the property or the environment because Judge Lester specifically found that plaintiff acted with no such intent. Plaintiff also points to this finding by Judge Lester as strongly suggestive that a genuine issue of material fact existed on the issue of intent and this is further reason that summary judgment should not have been granted to defendants.
Collateral estoppel, or issue preclusion, is part of the wider law of res judicata which prohibits relitigation of any issue actually determined in a prior action, generally between the same parties, involving a different claim or cause of action. State v. Gonzales, 75 N.J. 181, 186, 380 A.2d 1128 (1977); Mazzilli v. Accident & Casualty Ins. Co., 26 N.J. 307, 313-314, 139 A.2d 741 (1958). An equitable doctrine, it will be applied only when fair. Kozlowski v. Smith, 193 N.J. Super. 672, 675, 475 A.2d 663 (App. Div. 1984). One such equitable situation involves insurance companies *322 where there is a question about the insurer's duty to defend an action in the face of a coverage issue. Our Supreme Court has held that an insurer will not be prohibited from challenging a coverage claim in a proceeding upon the policy where it has not defended the insured in the liability litigation between the insured and a third party. Hartford Accident & Indem. Co. v. Aetna Life & Casualty Ins. Co., 98 N.J. 18, 24-25, 483 A.2d 402 (1984); Burd v. Sussex Mutual Ins. Co., 56 N.J. 383, 394, 267 A.2d 7 (1970); See Buinno, Current N.J. Rules of Evidence, Comment to Evid.R. 63(21) at 670 (1990) ("Note that the judgment offered under Rule 63(21) is not admissible as proof of the indemnity obligation."). The liability trial between plaintiff's predecessor and the DEP did not touch upon the issue of insurance coverage. The question of plaintiff's intent in creating and dumping mercury-laden effluent to course over its property and end up in Berry's Creek was not considered in the context of insurance policy provisions, but only in terms of statutory and common-law liability for such acts. Not having the opportunity to present its views in court on plaintiff's intent relative to the policies issued by them, defendant insurers certainly are not now precluded from litigating the issue by Judge Lester's findings on intent.
Clearly from the context of Judge Lester's opinion, his observations about plaintiff's predecessors' intent were made in a far different context than on the summary judgment motion in this coverage case. Judge Lester, having found plaintiff strictly liable on statutory grounds, turned to consider an alternative basis for liability asserted by the State, namely, nuisance theory liability. He began by finding that the State had established plaintiff's liability under a statutory nuisance theory. He then moved onto the State's claim that plaintiff was liable under a common law nuisance theory, an assertion which Judge Lester rejected on the basis that the State failed to prove intentional conduct on the part of plaintiff. Judge Lester examined the term "intent" as it "is used in the law of torts." He found that
[w]hat is meant is that the actor acts for the purpose of causing the invasion of another's interest or knows that such an invasion is resulting or is substantially *323 likely to result from those acts. Surely Berk and WRCC intended to and volitionally did manufacture mercury compounds and dumped waste on the Velsicol property. However, the court cannot find that the acts were done with the intent to pollute the waters of the State with the knowledge that such an invasion was substantially certain to occur. No such knowledge or intent may be imputed to defendants under an intentional tort theory.
The judge was not considering whether plaintiff's conduct was intentional within the meaning of the insurance policy provisions which were before Judge Huot. His findings are not conclusive against the insurers under the circumstances.
Perhaps the more debatable aspect on this appeal is whether Judge Huot overreached the bounds of a summary judgment motion judge when he resolved the issue of plaintiff's intent to injure against it as a matter of law on the evidence before him. Most recently this court has cautioned that
Summary judgment should not be granted where the adjudication of such a motion would constitute what is in effect a trial by affidavits on issues of fact... Moreover, the court should be particularly hesitant in granting summary judgment where questions dealing with subjective elements such as intent, motivation and duress are involved. [Citations omitted] In short, summary judgment should be denied unless the right thereto appears so clearly as to leave no room for controversy.
Shanley & Fisher, P.C. v. Sisselman, 215 N.J. Super. 200, 211, 521 A.2d 872 (App.Div. 1987). On the other hand, since both sides moved for summary judgment, one may fairly assume that the evidence was all there and the matter was ripe for adjudication. "It is equally well settled, however, that where no factual disputes are present, or the undisputed facts demonstrate that one party is entitled to judgment as a matter of law, summary judgment in favor of that party is entirely appropriate." Collins v. Am. Optometric Ass'n., 693 F.2d 636, 639 (7th Cir.1982). We appreciate that cross-motions for summary judgment do not, of necessity, obviate a plenary trial on disputed issues of fact. O'Keeffe v. Snyder, 83 N.J. 478, 487, 416 A.2d 862 (1980); Asbury Park Press v. City of Asbury Park, 23 N.J. 50, 56, 127 A.2d 401 (1956). But when there is no material issue of fact and one party is entitled to a judgment as a matter of law, summary judgment is mandated. Indeed, this action bears a close resemblance to two federal *324 district court cases involving coverage claims arising from long-term pollution activities by the alleged insureds which had culminated in trials and adverse liability verdicts in state courts on the pollution damage claims. In both cases the federal courts sensibly reviewed the records of the underlying state proceedings against the insured, analyzed the coverage issues, and ruled as matter of law on summary judgment that there was no coverage for the long-term pollution-causing activity. See Alcolac, Inc. v. St. Paul Fire & Marine Ins. Co., 716 F. Supp. 1541 (D.Md. 1989); American Motorists Ins. Co. v. General Host Corp., 667 F. Supp. 1423 (D.Kan. 1987).
Judge Huot concluded that what might ordinarily be an issue of fact  the question of intent  based on the undisputed record before him, was a question of law and that plaintiff intended to injure the land and the creek as a matter of law. Thus, the critical question is whether intent, in this context, can be determined as a matter of law. There is recent precedent in this court that the nature of an act, specifically child molestation, may be deemed intentionally injurious as a matter of law. In Atlantic Employers v. Tots & Toddlers, 239 N.J. Super. 276, 277, 571 A.2d 300 (App.Div. 1990), certif. denied, 122 N.J. 147, 584 A.2d 218 (1990), we affirmed the entry of summary judgment in favor of the plaintiff insurance company where its insured, the co-owner of a day care center, was charged with sexually abusing certain children. The wife, the other owner of the center, and the corporation (the center) were also sued for negligence in supervision. The policy issued by plaintiff to the corporation and the owners provided coverage for an occurrence as long as the injury or damage which resulted therefrom was "neither expected nor intended by the insured." Specifically excluded was coverage for personal injuries which resulted from a violation of a penal statute. Id. 239 N.J. Super. at 281, 571 A.2d 300. Appellants-intervenors were parents of the allegedly abused children who had been denied their right to intervene; they appealed as well from the summary judgment entered in favor of the insurance company on the grounds that there was no coverage for intentional acts. They *325 argued that even though the alleged molester had the requisite level of intent to be found criminally liable for sexual molestation, that did not mean that he intended to inflict the damages or injuries incurred by the children as a result of his actions. They claimed that intent was open to factual dispute and thus summary judgment was inappropriate.
Judge Scalera, writing for this court, held that while there were "no New Jersey cases directly on point," he agreed with the position of Minnesota and New Hampshire that certain acts, such as here involving a sexual assault upon a child, were "inherently injurious and could not be treated as an accidental cause of injury under the insurance policy." Id. at 283, 571 A.2d 300. Characterizing the test as an objective one, he concluded that
As a matter of public policy and logic we conclude that the better rule warrants application of the objective approach. A subjective test suggests that it is possible to molest a child and not cause some kind of injury, an unacceptable conclusion. Certainly one would and should expect some physical or psychological injury or both to result from such acts.
Ibid. The summary judgment with respect to the wife and the corporation was reversed, since the complaint alleged negligence in their supervision and operation of the day care center, conduct for which coverage may be afforded under the policy. Id. at 284-285, 571 A.2d 300. No other reported decision in this State has considered precisely whether intent can be inferred as matter of law from the factual complex in an insurance coverage case. Not so in other jurisdictions. Many jurisdictions subscribe to the principle that, for purposes of determining coverage under liability insurance policies, "intent to injure may be shown by proof of actual intent to injure, or it may be inferred from the nature and character of the act." Western World Ins. Co. v. Hartford Mut. Ins., 600 F. Supp. 313, 319 (D.Md. 1984). Accord, J.C. Penney Cas. Ins. Co. v. M.K., 52 Cal.3d 1009, 278 Cal. Rptr. 64, 804 P.2d 689 (1991) (coverage under liability policy for sexual molestation of child unavailable whether or not insured subjectively intended harm); Landis v. Allstate Ins. Co., 546 So.2d 1051, 1053 (Fla. 1989); Heshelman v. Nationwide Mut. Fire Ins. Co., 412 N.E.2d *326 301, 302 (Ind. Ct. App. 1980); Truck Ins. Exchange v. Pickering, 642 S.W.2d 113, 116 (Mo. Ct. App. 1982); State Farm Fire & Casualty Co. v. Victor, 232 Neb. 942, 442 N.W.2d 880, 883 (1989). See also, Annotation, Construction and Application of Provision of Liability Insurance Policy Expressly Excluding Injuries Intended or Expected by Insured, 31 A.L.R.4th 957, 988 (1984), § 5[b] "Intent actual or inferred by nature of act."
The precise controlling theory for ascertaining intent of the insured may fairly be called obscure, if not uncertain, since Ambassador Ins. Co. v. Montes, 147 N.J. Super. 286, 371 A.2d 292 (App.Div. 1977), aff'd on other grounds, 76 N.J. 477, 388 A.2d 603 (1978) (Pashman, J. and Handler, J. concurring; Clifford, J., dissenting) (fire victim may recover from arsonist's liability carrier because arson, not injury or death, intended). That case does make clear that where there is intentional wrongdoing, the insured may not benefit from the carrier's obligation to pay an innocent wrongdoer; indeed, the insured must reimburse the carrier by way of subrogation. "This application of subrogation is consonant with its traditional usage as an equitable mechanism to force the ultimate satisfaction of an obligation by the person who in good conscience should pay." 76 N.J. at 484, 388 A.2d 603. Thus, Ambassador Ins. Co. v. Montes offers no solace to an intentional polluter who wants to recover remediation, cleanup and defense costs from its liability carrier.
Our cases have demonstrated that construction of the term "intent" in the context of liability insurance policies may depend on the language of the particular policy provision. In Ambassador Ins. Co. v. Montes, supra, the Supreme Court had no policy provision before it dealing with intent but, in affirming the Appellate Division result, implicitly adopted an objective standard by which to measure intent. This standard does not require that the insured intend the consequences that actually flow from his actions; it is sufficient if he knows that the injuries are certain or substantially certain to result from his actions to establish that he intended the injury. 147 N.J. Super. at 291-292, 371 A.2d 292. As *327 Justice Pashman pointed out in his concurring opinion in Ambassador, supra, this concept of intent may conflict with the more subjective standard sometimes used for evaluating intent in liability insurance policy cases. That rule was set out in Lyons v. Hartford Ins. Group, 125 N.J. Super. 239, 310 A.2d 485 (App.Div. 1973), certif. denied, 64 N.J. 322, 315 A.2d 411 (1974). There the policy provision under scrutiny was an exclusion which prohibited recovery under the policy for those instances where there was bodily injury "which is either expected or intended from the standpoint of the insured." Id. at 244, 310 A.2d 485. In determining whether a particular injury was either expected or intended from the viewpoint of the insured the panel in Lyons articulated the following principle:
The general rule is that coverage exists under insuring and exclusion clauses identical or similar to the ones involved here for the unintended results of an intentional act, but not for damages assessed because of an injury which was intended to be inflicted.... . [T]here is coverage for unintended results.
....
Thus, the distinction between intended and unintended results of intentional acts is well recognized. The trial court did not apply this principle. The oral opinion below can be construed as holding that if Lyons [the insured] intended to fire without any specific intent to cause death or bodily harm, coverage did not exist.... The short of it is, if Lyons intended to maim or kill Berger [the victim] he has no coverage. If his intent was, as he says, to fire a warning shot, but he unintentionally fired prematurely, coverage exists. [Id. at 245, 247, 310 A.2d 485.]
This court noted that whether the exclusionary clause was phrased as excluding injuries "either expected or intended from the standpoint of the insured," the result would be the same as if the exclusionary clause precluded coverage for injury "caused intentionally by or at the direction of the insured." Id. at 247, 310 A.2d 485.
The subjective and objective standards of intent were recently discussed and the principles applied by this court in Allstate Ins. Co. v. Schmitt, 238 N.J. Super. 619, 570 A.2d 488 (App.Div. 1990), certif. denied, 122 N.J. 395, 585 A.2d 394 (1990). There we made it quite clear that the construction of an exclusionary clause and the standard of intent required thereunder may depend upon the language of the particular policy provision. In that case we *328 rejected the insured's and the victim's arguments favoring a subjective construction of intent and their reliance upon Ambassador and Lyons. In Schmitt, Allstate's insured and the corporate owner of a cocktail lounge were defendants in a suit charging the insured with assault. The insured had pled guilty to an indictment charging him with aggravated assault by recklessly causing bodily injury to another with a deadly weapon. Id. at 621-622, 570 A.2d 488. Allstate instituted a declaratory judgment action to resolve the coverage issue when the insured notified Allstate that Schmitt, the victim, was asserting a claim. The insured and Schmitt contended that the policy did not exclude claims for the unintended results of criminal conduct. The insurer relied upon a policy provision which asserted that it did "not cover any bodily injury or property damage which may reasonably be expected to result from the intentional or criminal acts of an insured person which is in fact intended by an insured person." Id. at 623, 570 A.2d 488. Relying upon Ambassador and Lyons, Schmitt and the insured claimed that the policy exclusion was confined to instances where the insured intentionally injured his victim and subjectively desired to cause the type of harm actually inflicted. We disagreed.
Judge Baime, writing for the panel, pointed out that the policy provisions under scrutiny in Ambassador were clearly distinguishable from the policy provision found in Allstate's policy. In Ambassador, there was no exclusionary clause or policy limitation under consideration by the majority. The provision in Lyons, supra, excluded coverage for bodily injury which was "either expected or intended from the standpoint of the insured." Id. 125 N.J. Super. at 265, 310 A.2d 485. In Allstate's exclusionary provision
Conspicuously absent are the words "intended" and "from the standpoint of the insured," words that can reasonably be said to connote a subjective element hinging upon the actual desire to inflict injury harbored by the insured. In contrast, the Allstate exclusion is not altogether premised upon a subjective intent to injure another. Instead, the factual predicate to the exclusion is either the commission of a crime, whether or not intentional, or the doing of an intentional act. [Id. at 626, 310 A.2d 485.]
*329 We explicitly rejected the assertion that use of the words "reasonably ... expected" added a subjective element to the exclusion and required a conscious desire to inflict injury upon the victim. We saw those words as
... designed to insure that the policy's protection would be accorded to idiosyncratic unforeseeable or wholly attenuated consequences of the insured's criminal or intentional act. As we read the policy language, the exclusion was not intended to apply to the remote or highly extraordinary or improbable consequences of the insured's criminal or intentional conduct. [Id.]
We pointed out that the exclusionary clauses in the provision were phrased in the disjunctive so that coverage was prohibited where bodily harm was in fact intended by the insured  clearly requiring subjective intent. To interpret the phrase "reasonably be expected" as also to require a subjective intent would render the clause redundant. Id. 125 N.J. Super. at 266-267, 310 A.2d 485.
In the present case, seven insurance companies issued various policies to plaintiff. Five of those companies' policies contained identical provisions; the remaining two have different provisions which are identical to each other. General Accident, Liberty Mutual, American Home, Affiliated FM and First State all issued plaintiff liability policies providing coverage for an occurrence which they each defined as "an accident, including continuous or repeated exposure to conditions which result in bodily injury or property damage that is neither expected or intended from the standpoint of the insured." General Accident's policies issued in 1964 and 1965 defined occurrence slightly differently: as an "unexpected event or happening which results in property damage provided that the insured did not intend or anticipate the result." London Market Insurers and Continental Casualty issued policies to plaintiff providing coverage for an occurrence which was defined as an accident (London Market Insurers) or an event (Continental Casualty) which unexpectedly or unintentionally caused injury or property damages.
Thus, the provisions themselves are similar to, if not identical with, the provisions in those cases where our courts have determined that the character of the act can be the basis of an *330 inference that the insured intended the injury. Accepting this principle adds a sensible dimension to the concept of intent for purposes of liability insurance policy construction. This principle makes the actor's testimony about subjective intent less than controlling but allows a judge to conclude, from the circumstances of the act, what the actor's real intent was, despite verbal protestations to the contrary. It restrains the court from "ignor[ing] reality" and accepting "the testimony of the insured" that he "did not intend to injure plaintiff' despite the fact that a "reasonable analysis [of the circumstances] requires the conclusion that from the very nature of the act harm must have been intended." State Farm Fire & Casualty Co. v. Victor, supra, 232 Neb. 942, 442 N.W.2d at 883, quoting Jones v. Norval, 203 Neb. 549, 554-555, 279 N.W.2d 388, 391-392 (1979). In the case before us, as in the child sexual molestation case, Atlantic Employers v. Tots & Toddlers, supra, 239 N.J. Super. 276, 571 A.2d 300, we conclude that the concepts of the insured's expectation, its intent and its conduct really become indistinguishable. The intentional character of the act is the basis for the inference that the insured either intended or was manifestly indifferent to the prospect of the injury.
The Second Circuit, in expressing its view of New York law, summarized the concept of "damages expected or intended by the insured" well. It said in City of Johnstown, N.Y. v. Bankers Standard Ins., 877 F.2d 1146, 1150-1151 (2d Cir.1989):
In general, what makes injuries or damages expected or intended rather than accidental are the knowledge and intent of the insured. [Citation omitted]. It is not enough that an insured was warned that damages might ensue from its actions or that, once warned, an insured decided to take a calculated risk and proceed as before. [Citations omitted]. Recovery will be barred only if the insured intended the damages, [citation omitted], or if it can be said that the damages were, in a broader sense, "intended" by the insured because the insured knew that the damages would flow directly and immediately from its intentional act [citations omitted]. In those instances, coverage is precluded because the damages are not "accidental."
In Chesler, Rodburg & Smith, Patterns of Judicial Interpretation of Insurance Coverage for Hazardous Waste Site Liability, 9 Rutgers L.J. 9 (1986), the authors have thoroughly traced the *331 history of the standard form comprehensive general liability policy from the "caused by accident" clause, through coverage for "occurrence" in the 1966 industry-wide change, to the current pollution exclusion clause with the "sudden and accidental" exception. The authors summarized the history of judicial interpretation of these clauses this way: "Coverage will exist for the unintended adverse results of intentional acts except where the court determines that the harm involved was so certainly foreseeable to the insured as to have been constructively intentional." Id. at 70. The ruling in the Law Division adverse to Morton's coverage claim is another example of the principle in application. Throwing toxic waste out into the meadowlands was no accident or "calculated risk."
We agree that this principle expressed by the Rutgers L.J. authors and the Second Circuit in City of Johnstown is sound and operates to explain and justify the decision under review. In contemporary parlance, what did plaintiff's predecessors know about the toxicity and mercury content of its effluent and when did they know it? As early as 1956 plaintiff knew that the effluent which ran into Berry's Creek was unacceptable to the New Jersey Department of Health, which had inspected the plant and found that it had unacceptably high suspended solids content and that the settling tank was not large enough. The Department of Health continued to inspect the facility through 1959, consistently recommending that a waste water treatment system be devised "in order to eliminate pollution of Berry's Creek." In 1959 plaintiff hired Edward R. Grich, Inc. to study the waste problem and to recommend treatment systems. Another report was commissioned and completed in February 1960 but apparently none of its suggestions were adopted. A February 1960 report issued by the State Department of Health found no waste treatment system but found mercury compounds peculiarly absent from the effluent it tested at that time. Plaintiff was directed to institute a waste treatment plan because the industrial waste effluent was unacceptable for discharge into Berry's Creek. Apparently nothing more happened between 1960 and 1965 except that plaintiff promised, in *332 May 1965, to begin design and construction of a treatment plant within one month. This promise was not kept either.
By February 14, 1968 corporate officials acknowledged that a complete treatment procedure had not yet been developed and, at least in part, due to the effluent problems, the plant was sold to Ventron. The sale price no doubt recognized the environmental problems. An intramural Velsicol memorandum of February 14, 1968 stated:
I met with Mr. Harry Hughes and Mr. Ben Burke. Mr. Douglas Clark was detained for personal reasons and joined the meeting at 3:30 PM. However I had the opportunity to explain to all three the background history of the problem. Briefly, my explanation was as follows: In 1964-65 Wood Ridge took a first step toward the solving of the effluent problem in construction of a new chemical sewer system throughout the plant thereby combining all chemical wastes at the south east property corner. This system eliminated dilution of effluent by plant cooling water and surface drainage thereby allowing studies of effluent from this source.
From that date, various investigations by both Edward R. Grich and our own staff have been made. To date a complete treatment procedure has not been developed. Procedures have been established for Ph control and solids removal but none for reduction of BOD and COD.
The parent company, Velsicol Chemical Corp. became disenchanted with the Wood Ridge operation (for various reasons) and approximately 2 years ago decided to sell. The local W-R Management was unaware of this decision for some time but the result was that little or no progress was made on effluent problems.
On February 1, 1968, Wood Ridge Chemical was purchased by Ventron, Beverly, Mass. This parent company is aware of the problem and will aggressively support efforts to meet State and Federal requirements. As a start, this problem has become my responsibility as Vice President and Plant Engineer of W.R.C.C.
Substantial environmental pollution over a long period was manifest in this record. The polluter knew that the substance being discharged into the environment was toxic and harmful. In this context, to condone intentional pollution over a long period of time as portending no expectation of harm is an "unacceptable conclusion." Atlantic Employers v. Tots & Toddlers, supra, 239 N.J. Super. at 283, 571 A.2d 300. We affirm the conclusion that, as a matter of law, on this factually undisputed record, plaintiff intended to cause harm to the environment in and around Berry's Creek.
*333 Juxtaposed to the documentary evidence is an affidavit by Joseph Bernstein, general manager of Wood Ridge Chemical and Ventron from 1968 through 1979 in which he asserted "that at no time during our ownership did we intend or expect that our manufacturing processes, our effluent treatment process or our disposal system were then harming the environment, nor did we intend or expect that they would ever do so." He also asserted that in light of their efforts to implement more efficient chemical processes and effluent treatment measures it never occurred to the company that the product of their mercury plant was ever going to harm any life form or the environment. In its brief plaintiff also points to certain portions of Bernstein's deposition and trial testimony excerpted in the record indicating that it never expected or intended the discharges to harm the environment. Those portions of Bernstein's testimony developed nothing more than the fact that the company tried to minimize mercury loss in the product for profit and loss reasons, not necessarily to protect the environment.
We conclude that the evidence in this extensive record was sufficient to permit Judge Huot to conclude as a matter of law that plaintiff's predecessors intended to pollute Berry's Creek. Indeed, any contrary conclusion would require the judge to sit with blindfolds and defer the inevitable conclusion. Our Supreme Court concluded from the record in the pollution trial that "the tract is saturated by an estimated 268 tons of toxic waste, primarily mercury." 94 N.J. at 481, 468 A.2d 150. "The concentration of mercury in Berry's Creek is the highest found in fresh water sediments in the world." Id. "The contamination at Berry's Creek results from mercury processing operations carried on at the site for almost fifty years." Id. at 482, 468 A.2d 150. And, "Ventron knew that the site was a man-made mercury mine." Id. at 485, 468 A.2d 150. The evidence supports Judge Huot's finding that plaintiff intended to harm the environment as a matter of law. He specifically found that the end result was "substantially certain to follow" and "not fortuitous." Judge Huot specifically noted in his opinion:

*334 The trial court in the underlying litigation either overlooked or was unaware of certain documents in arriving at its conclusion that Berk and Wood Ridge intended to dump hazardous substances but did not intend to pollute the waters of the State. The demonstrative evidence appended to the briefs submitted by plaintiff and defendants establishes otherwise.
The judge would have ignored reality to conclude that plaintiff's predecessors did not know that the mercury and its effluent was harmful to the land over which it coursed and the waters into which it fell.

II
In its next two points, which are related to the issue just discussed, Morton contends that Judge Huot erred in holding that the injury done to the environment by the mercury was not caused by accident within the meaning of General Accident's pre-1966 policies and that he also erred in determining that no "occurrence" took place warranting coverage under any of the expanded-definition post-1965 policies issued by the other defendant insurance companies. The "occurrence based coverage" was designed to embrace "not only the usual accident, but also exposure to conditions which may continue for an unmeasured period of time." See Broadwell Realty v. Fidelity & Cas., 218 N.J. Super. 516, 533, 528 A.2d 76 (App.Div. 1987).
As noted in I post, only General Accident's policy issued in 1964 specifically provided insurance for bodily injury or property damage "caused by accident" which occurred during the policy period and the policy did not define "accident." Indeed, the standard general comprehensive liability insurance policy in use throughout the industry at that time, before 1966, contained no such definition. Broadwell Realty v. Fidelity & Cas., supra, 218 N.J. Super. at 532, 528 A.2d 76. Without a definition, the courts were left with the task of defining the word "accident." The general definition which emerged stated that an accident was "an unexpected happening without intention or design." Ibid. "Accident" was defined broadly on the theory that words, undefined by an insurer, should be generally construed in favor of the insured to effect *335 coverage where tenable. McGroarty v. Great American Insurance Company, 36 N.Y.2d 358, 368 N.Y.S.2d 485, 488, 329 N.E.2d 172, 175 (1975). Thus, broadly construed the word "accident" would encompass a volitional act by the insured "if the insured did not specifically intend to cause the resulting harm or [was] not substantially certain that such harm w[ould] occur." Broadwell Realty v. Fidelity & Cas., supra, 218 N.J. Super. at 532, 528 A.2d 76, quoting Quincy Mut. Fire. Ins. Co. v. Abernathy, 393 Mass. 81, 84, 469 N.E.2d 797, 799 (1984).
Judge Huot, however, used the more restrictive definition of accident set out in Doria v. Ins. Co. of North Am., 210 N.J. Super. 67, 72, 509 A.2d 220 (App.Div. 1986). Under scrutiny in that case was a homeowner's insurance policy which provided coverage for an occurrence which was defined as an accident which results in bodily injury; "accident" was not defined otherwise in the policy. Therefore, this court in Doria used a generally accepted definition to assert that "accident" meant "a sudden and fortuitous event, unexpected by the person to whom it happens." Judge Huot determined that since the policy before him phrased coverage in terms of an injury "caused by accident," the focus should be upon the manner in which the injury was caused, not on the result of an event. He concluded that the policy did not insure against an unexpected, unplanned and unanticipated result which proceeded from a deliberate act and thus found no coverage under General Accident's earlier policy. Plaintiff, Morton, now asserts that the judge too narrowly read the definition of accident and should have focused instead on the Broadwell articulation which concludes that an accident can indeed occur as a result of a volitional act if there was no specific intent to cause the resulting harm and the actor was not substantially certain that such harm would occur.
We conclude that Judge Huot did err to the extent that he did not recognize that volitional acts could result in damage which would qualify as an accident if the requisite conditions were met, that is, no specific intent to cause a resulting harm or no substantial certainty that such harm would occur. See Quincy Mut. Fire *336 Ins. Co. v. Abernathy, supra, 393 Mass. at 84, 469 N.E.2d at 799, cited and quoted in Broadwell Realty, supra, 218 N.J. Super. at 532, 528 A.2d 76. Judge Huot's reliance on the Doria definition of accident was misplaced since the Doria policy was clearly a post-1966 policy in which occurrence and accident have been defined synonymously and where the term "occurrence" has been interpreted as focusing on the underlying circumstances of the event which gave rise to the injuries rather than the injury itself. Doria, supra, 210 N.J. Super. at 72, 509 A.2d 220. In the present case, General Accident's policy is a pre-1966 policy which left the definition of "accidents" to the courts which more broadly construed the term.
This does not compel a conclusion by us that this error requires reversal of the grant of summary judgment to defendants in this case. Looking at the broader form of the definition of "accident," plaintiff could be successful only if it could be said that it was not substantially certain that harm to the environment would occur if pollutant-laden effluent were dumped into the environment, allowed to traverse across the land, and eventually seep into Berry's Creek. As discussed in I supra, the evidence was overwhelming that plaintiff's predecessors must have been substantially certain that such harm would occur given its knowledge of the dangerous propensities of its effluent as early as 1956. The company was warned repeatedly by the Department of Health in those early years that its effluent had to be treated because unacceptable levels of pollutants were entering Berry's Creek. Thus, plaintiff must have been substantially certain that if it did not take steps to abate the pollution, harm surely would occur to Berry's Creek. Consequently, plaintiff's actions did not come within the broader definition of "accident" set out in Broadwell Realty, supra, 218 N.J. Super. at 532, 528 A.2d 76 ("an unexpected happening without intention or design").
Plaintiff's reliance upon City of Johnstown, N.Y. v. Bankers Standard Ins., supra, 877 F.2d 1146, is misplaced. Plaintiff interprets that case as standing for the proposition that where an *337 insured takes a calculated risk in the face of warnings of potential injuries, insurance coverage will not be denied. Nevertheless, there was much more to City of Johnstown. Coverage was found there because the proofs failed to establish that the City should have expected that its landfill would pollute surrounding ground waters. Not so in the present case. Proof of plaintiff's awareness of its actions and the inevitable potential consequences thereof are abundant. This was no "calculated risk" by Morton's predecessors. The knowledge of environmental harm was sure and certain. We must remember, in comparison, that in Broadwell Realty, supra, 218 N.J. Super. at 519, 528 A.2d 76, the pollution was caused by an "unforeseen and unexpected discharge of contaminants from fissures in underground storage tanks on the insured's property and the migration of such pollutants on the lands of third persons."
Other recent examples of construction of general liability policies in cases involving alleged "sudden and accidental" events where insureds sought coverage under the pollution exclusion exception in the current version of the CGL policy include: The Upjohn Company v. New Hampshire Ins. Co., 438 Mich. 197, 476 N.W.2d 392 (1991) (by 4-3 vote Court decided known leak from storage tank not sudden and accidental); A. Johnson & Co. v. Aetna, 741 F. Supp. 298 (D.C.Mass. 1990), aff'd, 933 F.2d 66 (1st Cir.1991) (Maine law  leaching and seeping through land and ground water not "sudden and accidental"); Weber v. IMT Ins. Co., 462 N.W.2d 283 (Iowa 1990) (Iowa law  hog manure spilled and tracked on road over several years not "sudden and accidental"); FL Aerospace v. Aetna, 897 F.2d 214 (6th Cir.1990) (Michigan law  mere delivery of liquid waste not "sudden and accidental" event sufficient to trigger coverage); Cf. James Graham Brown Foundation, Inc. v. St. Paul Fire and Marine, 814 S.W.2d 273 (Ky. 1991) (case not appropriate for summary judgment on issue of insured's intent). These interpretations of the current version of pollution exclusion and its exception by the courts are simply a "reaffirmation that coverage will not be provided for *338 expected and hence avoidable results." Broadwell Realty, supra, 218 N.J. Super. at 535, 528 A.2d 76.[1] *339

*340 III
Plaintiff also contends that General Accident, Liberty Mutual and Affiliated FM are bound by Judge Lester's findings, particularly the finding that plaintiff had no intent to pollute, because they wrongfully refused to defend plaintiff in the underlying lawsuit. Plaintiff also asserts that Judge Huot erred in concluding that Affiliated FM and Liberty Mutual were not obligated to provide a defense to the Wolf crossclaim because some of the counts in the crossclaim were arguably within those carriers' obligation to indemnify plaintiff.
Plaintiff contends that an insurer's duty to defend is broader than its obligation to indemnify and thus, where allegations in a complaint are arguably within the coverage obligation, the insurer has a duty to provide a defense even though other allegations in the complaint are arguably outside the policy's coverage. Plaintiff maintains that Judge Huot should have found those three carriers liable for the defense of the Ventron litigation because at least some of the allegations in the complaint and crossclaim could potentially have come within the policy's coverage.
Plaintiff's statement of the law is a general rule concisely articulated by Judge Pressler in Hartford Ins. Group v. Marson Constr. Corp., 186 N.J. Super. 253, 257, 452 A.2d 473 (App.Div. 1982), cert. denied, 93 N.J. 247, 460 A.2d 656 (1983):
As a general proposition, it is clear that under the typical liability policy, the duty of an insurer to defend is broader than its obligation to indemnify. The insurer's obligation to defend is triggered by a complaint against the insured alleging a cause of action which might potentially come within the coverage of the policy, irrespective of whether it ultimately does come within the coverage and hence irrespective of whether the insurer is ultimately obliged to pay. This principle, of course, applies where there is a factual issue between the third-party *341 claimant and the insured, the resolution of which may result in an adjudication that at least part of the claim against the insured is within the policy coverage.
Our Supreme Court has twice held that that principle does not apply universally, but
when coverage, i.e., the duty to pay, depends upon a factual issue which will not be resolved by the trial of the third party's suit against the insured[;] the duty to defend may depend upon the actual facts and not upon the allegations in the complaint. [Burd v. Sussex Mut. Ins. Co., 56 N.J. 383, 388, 267 A.2d 7 (1970).]
The factual complex in Burd is analogous to the present case. There the victim, D'Agostino, sued Burd for damages he incurred after Burd shot him; Burd was criminally convicted of atrocious assault and battery. The two-count civil complaint charged that Burd both intentionally and negligently fired a loaded gun at D'Agostino. Burd's homeowner insurance carrier, Sussex Mutual, refused to defend the suit on the ground that the policy expressly excluded coverage for bodily injury or property damage caused intentionally by or at the direction of the insured. Burd retained his own counsel and the civil suit resulted in a general verdict for D'Agostino. Burd then sued the carrier to recover the amount of the judgment and the costs incurred in defending the action. Cross-motions for summary judgment were resolved in Burd's favor but that result was reversed by the Supreme Court.
As in the present case, Burd and his carrier each claimed that the other was bound by the judgment in a prior proceeding. The carrier claimed Burd was bound by the finding of intentional conduct in the criminal proceeding; Burd claimed that the carrier, having refused to defend the civil action, could not challenge his present allegation and the jury's implicit finding that the injuries were negligently, rather than intentionally, inflicted. In rendering summary judgment for Burd, the Law Division judge held that the carrier was bound by the civil jury's finding of negligent conduct. The Supreme Court disagreed and explained:
The sense of the covenant is to defend suits involving claims which the carrier would have to pay if the claimant prevailed in the action. The covenant to defend is thus identified with the covenant to pay. That is the basis of the rule that ordinarily a carrier who defends unsuccessfully may not later deny coverage, absent an express agreement with the insured reserving a right to deny coverage....

*342 Here the obligation to pay a judgment obtained by the injured party depended upon whether the injuries were intentionally inflicted within the meaning of the exclusionary clause. There may be cases in which the interests of the carrier and the insured coincide so that the carrier can defend such an action with complete devotion to the insured's interest. But if the trial will leave the question of coverage unresolved so that the insured may later be called upon to pay, or if the case may be so defended by a carrier as to prejudice the insured thereafter upon the issue of coverage, the carrier should not be permitted to control the defense. That was the situation in the case at hand. Although both the insurer and the insured would want D'Agostino to fail, yet if D'Agostino should succeed, as it was likely he would, the insured would want the basis to be negligence whereas the carrier would profit if the basis was an intentional injury within the policy exclusion. If plaintiff pressed his claim of negligence, the coverage issue would remain open, for the carrier could hardly insist the injuries were intentionally inflicted. Willfulness is not a defense to a charge of negligence. And if plaintiff sought a judgment for intentional hurt, the carrier could not be expected to resist that basis of liability with the fervor or fidelity of an advocate selected by the insured.
In such circumstances the carrier should not be estopped from disputing coverage because it refused to defend. On the contrary the carrier should not be permitted to assume the defense if it intends to dispute its obligation to pay a plaintiff's judgment, unless of course the insured expressly agrees to that reservation. This is not to free the carrier from its covenant to defend, but rather to translate its obligation into one to reimburse the insured if it is later adjudged that the claim was one within the policy covenant to pay. See Satterwhite v. Stolz, 79 N.M. 320, 442 P.2d 810 (Ct.App. 1968). [Id. at 388-390, 267 A.2d 7.]
The Court continued that, in instances where the carrier's position is so different from the insured's that the carrier cannot defend the action in good faith, there has to be a proceeding in which the carrier and the insured, represented by counsel of their own choosing, can resolve their differences. That action, as occurred in Burd as well as here, may follow the trial of the third-party's suit against the insured. The Court also suggested that a declaratory judgment proceeding could be brought prior to the third-party litigation so that the third-party suit could be defended by the party ultimately liable. Id. at 391, 267 A.2d 7. In the situation where a carrier does not defend the third-party claim because the coverage issue will not be there resolved, "it will have to reimburse the insured for the cost of defense if the tort judgment is held to be within the covenant to pay" after the separate proceeding is brought upon the policy. Id. at 394, 267 A.2d 7.
*343 The similarity between Burd and the case before us is at once apparent. The litigation between the DEP and plaintiff in the present case did not and could not resolve the issue of coverage under the policies involved. The four-count complaint alleged statutory violations emanating from the discharge of mercury and other hazardous substances onto the property and eventually into state waters (Counts I, II and IV) and also alleged a continuing public and private nuisance (Count III). The statutory violations did not require any finding of intent, only a finding of the prohibited discharge. Thus, intent was never in issue in three of the four counts. The fourth count charging public nuisance was based on a strict liability statute and the extension of the principle of strict liability under the common law. Again, intent was irrelevant. With respect to the private nuisance theory, it is clear that intent was relevant, but on that issue there would have been a clear conflict of interest between the insurer and plaintiff: plaintiff seeking a finding of unintentional conduct so as to escape the imposition of liability while the insurer, for purposes of coverage, would be interested in having the court find that the plaintiff-insured intended the consequences of its deliberate act. Thus, the very conflict which existed in Burd and caused the Court to conclude there was no absolute duty to defend from the outset also exists in the present case.
The principles articulated in Burd were affirmed by our Supreme Court in Hartford Accident & Indem. Co. v. Aetna Life & Casualty Ins. Co., 98 N.J. 18, 483 A.2d 402 (1984). There, the underlying suit was brought against a pharmaceutical house on behalf of an infant who had been prescribed a drug which caused her physical injuries. Aetna covered the company on the date the drug was dispensed. Hartford assumed coverage which was in effect on the date that the personal injuries to the child first became manifest. Thus, the dates on which the respective insurance companies coverages were in place (i.e., the date the drug was dispensed and the date the injuries were observed) were critical to a determination of which company was ultimately liable to pay the judgment against the pharmaceutical house. Hartford *344 had assumed the defense, paid the judgment, and incurred counsel fees and litigation costs for which it sought 50% of the amount on the ground that Aetna breached its duty to defend  a breach Hartford claimed imposed liability upon Aetna as a matter of law. Since the complaint simply alleged the month in which the events establishing the company's liability occurred, Hartford argued that the complaint on its face demonstrated that the allegation fell within the policy's coverage.
This court disagreed and the Supreme Court affirmed, adopting Judge Skillman's Law Division opinion. Judge Skillman relied primarily upon the holding in Burd. He concluded that, because of the conflict generated by the critical coverage issue, i.e., the chronology of the drug dispensation and the manifestation of the injuries in relation to the date the respective policies were viable, Aetna was within its rights in refusing to take over the defense on behalf of its insured and was justified in litigating the issue later in a separate proceeding. Moreover, the critical facts required to resolve the coverage question were extraneous to the trial of the child's claim against the pharmaceutical company. Had the jury been directed to answer relevant questions in the underlying action, this would have created a serious risk of complicating the trial, confusing the jury, and perhaps prejudicing the rights of the parties since the insurer would not have been represented by its own counsel at that action. Id. at 24-25, 483 A.2d 402. Judge Skillman noted that "the practical effect of Burd is that an insured must initially assume the costs of defense itself, subject to reimbursement by the insurer if it prevails on the coverage question." Ibid. This is precisely what occurred in the present case and is consistent with Burd and Hartford Accident & Indem. Co., supra. See also CPS Chemical Co. v. Continental Ins. Co., 203 N.J. Super. 15, 495 A.2d 886 (App.Div. 1985); Heldor Indus. v. Atlantic Mut. Ins., 229 N.J. Super. 390, 551 A.2d 1001 (App.Div. 1988).
Plaintiff here acknowledges the holding of Burd and Hartford and their progeny, but contends that they should be read "as consistent with the view that at least where the issue or issues *345 decided in the underlying case can resolve the issue of coverage and no conflict of interest has been asserted or claimed by the carrier at the time the defense was requested, the failure of the carrier to provide the defense estops the carrier from challenging the results." Although plaintiff maintains that its case "presents the factual premise for the application of these principles," the underlying case (DEP v. Ventron) did not resolve the issue of coverage and, indeed, could not have resolved it since the meaning of "intent," as that term was used by the insurance policies, was not then before the court. Moreover, the complaint itself should have put plaintiff on notice that a conflict of interest would arise between plaintiff and its insurance carriers because two of the counts alleged intentional, knowing pollution on the part of plaintiff.
The cases relied upon by plaintiff are readily distinguishable. In Dunne v. Firemen's Fund Am. Ins. Co., 69 N.J. 244, 353 A.2d 508 (1976), not only were the insurance policy provisions under scrutiny different from those in the present case, the insurer there had agreed at the outset to defend the action pursuant to a reservation of rights agreement with its insured. The policy imposed a duty on the insurer to defend if any theory of liability fell within the policy's coverage. The plaintiff in the underlying action in Dunne had alleged negligence which came within the policy coverage. Thus, the sole issue before the court was how to obtain performance of the insurer's previously admitted duty to defend the insured, in view of the potential conflict which arose if liability were imposed on some basis other than negligence. Dunne was not concerned with the task of interpreting a "duty to defend" clause of a policy. Rather, it was concerned only with the manner in which a previously acknowledged duty of an insured to provide a defense would be implemented. Dunne did not affect the holding of Burd which concerned the duties of an insurer where the duty to defend turned upon the existence of coverage and coverage was in dispute.

*346 IV
Plaintiff also contends that Judge Huot erred in denying its motion to compel discovery relating to the drafting history of what plaintiff calls "key policy terms" contained in the comprehensive general liability policies issued to it. Plaintiff sought underwriting information and statements which it alleged would show the behavior of the company with respect to these provisions and the interpretation the companies placed on the "polluter's exclusion" in order to ascertain the meaning of the policy provisions at issue. Apparently a number of these provisions were standard policy provisions drafted by the Insurance Service Office (ISO) which, the judge asserted, was information plaintiff had already received from another source. Furthermore there had been an indication that an individual from the ISO would be subpoenaed. As to those insurers who did not use the ISO policy form, the judge determined that he saw no relevance of this information to any of the issues in the case and that obtaining that information, at least as to Liberty Mutual, would require an inordinate amount of time, "an onerous burden which outweighs whatever possible relevance there might be if any."
On appeal, plaintiff relies upon Broadwell Realty, supra, pointing to our reference to the drafting history of the pollution exclusion in our analysis and interpretation of that clause in that case. 218 N.J. Super. at 533-534, 528 A.2d 76. According to plaintiff, if it had had the opportunity to present evidence about the history of the policy terms under scrutiny in the present case, "it might have been able to change Judge Huot's conclusion."
Our rules of discovery are liberally construed and accorded the broadest possible latitude. Shanley & Fisher, P.C. v. Sisselman, 215 N.J. Super. 200, 216, 521 A.2d 872 (App.Div. 1987). This principle permits a court to compel a party to produce all relevant, unprivileged information which may lead to the discovery of other relevant evidence. To that end, wide discretion is given to the trial court to determine the scope of discovery. Axelrod v. CBS Publications, 185 N.J. Super. 359, 372, 448 A.2d *347 1023 (App.Div. 1982); Howard Savings Inst. v. Francis, 133 N.J. Super. 54, 59, 335 A.2d 80 (App.Div. 1975).
Given plaintiff's reliance upon Broadwell Realty, it appears that plaintiff wanted information which would explain why the defendant carriers chose the particular language for their policy terms concerning coverage for accidents and occurrences, as well as exclusionary provisions. Broadwell, however, traced the history of the occurrence definition and the pollution exclusion, not through company documents and communications such as those sought by plaintiff in the present case, but rather through treatises and commentaries in legal publications. These were the sources which provided the data upon which this court based its conclusions about the meaning of those provisions. Here, plaintiff is not seeking industry-wide information about standard policy provisions. Plaintiff wants specific communications concerning the individual company's underwriters and their decisions to use certain phraseology in the policy provisions presumably to obtain a clarification about the intent behind the words chosen.

V
We now turn to the cross-appeal. General Accident contends that Judge Huot erred in finding that it had a duty to defend plaintiff on any count or theory alleged in the Ventron complaint after he found that it had no obligation to indemnify plaintiff. Relying upon Hartford v. Aetna, supra, 98 N.J. 18, 483 A.2d 402; Burd v. Sussex Mut., supra, 56 N.J. 383, 267 A.2d 7, and CPS Chemical Co., Inc. v. Continental Ins. Co., supra, 203 N.J. Super. 15, 495 A.2d 886, General Accident argues that its duty to defend is coextensive with its duty to indemnify and it was error for Judge Huot to have concluded otherwise. We agree.
Interestingly enough, Judge Lesemann identified this problem with Judge Huot's opinion but ruled that, at that point in the proceedings, he would not redetermine the issue of General Accident's duty to defend. Judge Lesemann pointed to other cases such as Ohio Casualty Ins. Co. v. Flanagin, 44 N.J. 504, 512, 210 *348 A.2d 221 (1965), and West v. MacDonald, 103 N.J. Super. 201, 212, 247 A.2d 20 (App.Div. 1967), aff'd o.b. 52 N.J. 536, 247 A.2d 129 (1968), which assert the proposition that the duty to defend is broader than the duty to pay  the nature of the damage claim, rather than the accident's actual details or the insurer's ultimate liability determines whether there is an obligation to defend. We see no inconsistency between that line of cases which follows the general principle that the duty to defend is broader than the duty to indemnify, and that line of cases, of which Burd and Hartford v. Aetna, are two, which hold that the duty to defend is coextensive with the duty to indemnify. The procedural posture of the individual case determines which principle will be applied in determining whether the duty to defend exists.
The facts and legal analysis of both Burd and Hartford v. Aetna have been set out. We need not travel that ground again. We find it sufficient to say here that the concept of the coextensive nature of the duty to defend and the duty to indemnify is applicable to those cases where there has already been litigation on the underlying tort action and the details of the claim against the insured have been fully and conclusively set to rest. At that point it is unnecessary to turn to the complaint to determine whether the duty to defend exists since the actual factual record concerning the underlying tort action has been established.
In cases like Ohio Casualty Ins. Co., supra, and, more recently, Hartford Ins. Group v. Marson Constr. Corp., supra, 186 N.J. Super. 253, 452 A.2d 473, no such factual determination had been made. In Hartford v. Marson, the underlying tort litigation was settled before the insurer had its day in court on its declaratory judgment action. Thus, when determining the issue of the insurer's duty to defend, all the court had before it was the complaint and the terms of the insurance policy. Id. at 256-257, 452 A.2d 473. Similarly, in Ohio Casualty Ins. Co., the insurer's declaratory judgment action was heard before the underlying tort action and, consequently, the court had only the allegations of the complaint against which to measure the insurer's duty to defend. *349 Interestingly enough, the Supreme Court in that case cautioned trial courts against entertaining declaratory judgment actions before the damage suit is resolved. The Court said that
Thus, where an insurer bases its entitlement not to defend a damage action upon the contention that the true facts are at odds with the allegations of that action, and those facts must of necessity be ultimately proved in the ensuing damage action, the court should exercise its discretion and refuse to entertain a declaratory judgment suit. Except in unusual cases, the court should normally also refuse to consider a declaratory judgment action prior to the filing of a damage suit against the insured, where the issue under the former necessitates a determination of the causation of the accident. The reason for such a conclusion is found in the fact that the basis of the insurer's liability will be determined by the proofs adduced in the damage action, and it cannot be ascertained in advance of trial what grounds of liability, if any, will be adjudicated against the insured. [44 N.J. at 512, 210 A.2d 221.]
Note that this court, in CPS Chemical Co., Inc. v. Continental Ins. Co., supra, and, more recently, in Heldor Indus. v. Atlantic Mut. Ins., supra, has held that where there are unresolved, critical factual issues the insurers are within their rights to deny a defense and await resolution of the coverage issue. We reverse the judgment against General Accident as to counsel fees and costs based on its alleged duty to defend.
Affirmed on the appeal; reversed on the cross-appeal.
NOTES
[1] We add this note as to the "pollution exclusion issue." London Market, American Home and the Amicus, as well as Liberty Mutual and Affiliated FM who join in those briefs on this issue, contend that the pollution exclusion clauses found in the policies bars coverage as a matter of law and provides an alternative basis for upholding the grant of summary judgment to them.

Judge Huot very briefly considered this argument noting first that five different forms of pollution exclusion clauses were found among the policies and that they each required interpretation of the words "sudden" or "accidental" in determining their applicability. Relying upon this court's decision in Broadwell Realty v. Fidelity & Cas. 218 N.J. Super. 516, 528 A.2d 76 (App.Div. 1987), he concluded that the "sudden and accidental" exception to the pollution exclusion was simply a restatement of the definition of occurrence. Since he found that no occurrence took place within the meaning of the policies before him, the applicability of the pollution exclusion clause became moot.
Only the policies issued by General Accident and Continental Casualty had no pollution exclusion. Judge Huot's observation was accurate when he indicated that there were various forms of the pollution exclusion in these policies. Affiliated FM, American Home, and Liberty Mutual pollution exclusions are identical. They refuse coverage to bodily injury or property damage
arising out of the discharge, disbursal, release or escape of smoke, vapors, soot, fumes, acids, alkali, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any water course or body of water, but this exclusion does not apply if any such discharge, disbursal, release or escape is sudden and accidental.
INA's pollution exclusion refuses coverage to bodily injury, personal injury or property damage
arising out of pollution or contamination
(1) caused by oil, or
(2) caused by the discharge or escape of any other pollutants or contaminants, unless such discharge or escape results from a sudden happening during a policy period, neither expected or intended from the standpoint of the insured.
London Market policies contain two different versions of the exclusion, one of which barred coverage for property damage "caused by seepage, pollution or contamination unless" it was caused by an accident during the policy period or, after the seepage, pollution or contamination, an accident occurs proximately causing property damage during the policy period. Another provision excludes coverage for personal injury or property damage "resulting from any gradual cause such as subsidence, seepage, pollution or contamination."
INA's pollution exclusion is the most differently worded because it denies coverage for property damage "resulting from the intentional or willful disposal of any waste products, fluids or materials."
Despite the language variance, these exclusions are united by a common thread: they all require that the property damage be caused by pollution which is either sudden, accidental, or unintentional in order for there to be coverage. American Home urges that we reconsider this entire area of the law interpreting pollution exclusions and essentially reject Broadwell Realty's, supra, analysis identifying such exclusions with a definition of occurrence. London Market does not take issue with Broadwell but argues simply that the judge's analysis was correct and should be upheld. The Amicus launches into an extended analysis of pollution exclusions, canvassing the various jurisdictions in support of its claim that Broadwell's analysis is incorrect. The Amicus concludes that the words "sudden" and "accidental" have independent meaning and should not be interpreted as analogous to "unexpected," and should not be tied into the definition of occurrence as our courts have interpreted that term. Our Supreme Court has yet to speak on pollution exclusions in general liability policies. We have analyzed this policy provision in Broadwell Realty, supra, and in Summit Assoc. v. Liberty Mut. Fire Ins., 229 N.J. Super. 56, 550 A.2d 1235 (App.Div. 1988), where Broadwell was reaffirmed as an appropriate method of analysis. The pollution exclusion under scrutiny in Broadwell Realty, supra, is phrased in terms identical to that found in Affiliated FM, American Home and Liberty Mutual's policies. There we adopted the approach taken by "substantial authority supporting the thesis that the pollution exclusion was intended to be coextensive with the scope of the definition of occurrence." 218 N.J. Super. at 533, 528 A.2d 76. Quoting other writers on the subject, we noted that this limitation of coverage was intended to apply only to the intentional polluter and was inapplicable to entities which neither expected nor intended their conduct to result in bodily injury or property damage. Id. at 534, 528 A.2d 76. We pointed to decisional law in our own State which interpreted pollution exclusions, particularly the "sudden and accidental" exception, as simply a restatement of the definition of "occurrence." Ibid. We agreed with that analysis finding that the pollution exclusion focused upon the intention, expectation and foresight of the insured. Id. at 535, 528 A.2d 76. Turning to the "temporal versus nontemporal" interpretation of "sudden," we observed that its construction of the exclusionary language had several benefits:
By defining the word "sudden" as meaning unexpected and unintended, we avoid the question whether the focus of the exclusion is upon the release of the contaminant or the resulting permeation and damage to the environment. This issue has generated substantial debate in those jurisdictions which have construed the word "sudden" in temporal terms. [Citations omitted] In other words, does the word "sudden" refer to the "time necessary for the ultimate loss to manifest itself fully," [citation omitted], or does it refer to the actual release, escape or discharge of the pollutant? If the word "sudden" is defined as "rapid" or "instantaneous," how is the exclusion to be applied to the abrupt escape of a pollutant from a fissure in a tank caused by a gradual corrosive process? Mere recitation of these issues discloses the investigative and evidentiary problems which would inexorably flow from adoption of the arguments advanced by Fidelity. [Id. at 535-536, 528 A.2d 76.]
The logic behind this aspect of Broadwell Realty, supra, is compelling, in our view.