215 N.J. Super. 200 (1987)
521 A.2d 872
SHANLEY & FISHER, P.C., PLAINTIFF-RESPONDENT,
v.
SELIG J. SISSELMAN, INDIVIDUALLY; AS TRUSTEE OF THE LORRAINE R. SISSELMAN TRUST FOR THE BENEFIT OF H. JEROME SISSELMAN UNDER AGREEMENT DATED JUNE 15, 1951: AS TRUSTEE FOR TWENTY-TWO ARNON TRUST FUND; AS TRUSTEE OF THE 1963 H. JEROME AND LORRAINE R. SISSELMAN TRUST (THE MICHAEL DANIEL TRUST); AS TRUSTEE OF THE H. JEROME SISSELMAN TRUST FOR THE BENEFIT OF LORRAINE R. SISSELMAN; AS PRESIDENT AND TRUSTEE OF THE H.J. SISSELMAN TORAH FOUNDATION; AS A PARTNER IN BERGEN COUNTY ASSOCIATES; AS A PARTNER IN SISSELMAN ISRAEL ASSOCIATES; AS A PARTNER IN INDUSTRIAL CONSTRUCTION ASSOCIATES; AS A PARTNER IN ESSENGEE INVESTORS; AS A PARTNER IN THE PACE GROUP; AND AS CO-EXECUTOR OF THE ESTATE OF H. JEROME SISSELMAN; AND DEANNA K. SISSELMAN, INDIVIDUALLY, DEFENDANTS-APPELLANTS.
Superior Court of New Jersey, Appellate Division.
Argued October 15, 1986.
Decided February 13, 1987.
*202 Before Judges MICHELS, O'BRIEN and LANDAU.
*203 Thomas H. Bruinooge argued the cause for appellants (Bruinooge & Andrews, attorneys; Thomas H. Bruinooge, of counsel and Pat Andrews on the brief).
John J. Francis, Jr. argued the cause for respondent, (Shanley & Fisher, attorneys, pro se; John J. Francis, of counsel; Judith A. Heim, on the brief).
The opinion of the court was delivered by MICHELS, P.J.A.D.
Defendants Selig J. Sisselman, individually and in various trustee and partner capacities (Sisselman), and Deanna K. Sisselman appeal from a summary judgment of the Chancery Division which (1) awarded plaintiff Shanley & Fisher, P.C., $289,702.34 against Sisselman for legal services rendered to him on behalf of all named defendants; (2) declared that a February 7, 1983 letter agreement executed by Sisselman, individually, was valid and binding; and (3) dismissed with prejudice any and all other matters raised in the action.
The pleadings, affidavits and the voluminous exhibits establish that in early 1981 Sisselman's sisters and brothers-in-law commenced an action against him in which they disputed the management and/or control of: (1) a general partnership in which the Sisselman family had substantial interests; (2) the development of certain Berry's Creek Center property which was owned by these partnerships; and (3) various family trusts. These suits were filed some months after the death of Sisselman's father, H. Jerome Sisselman, on August 20, 1980. Prior to H. Jerome's death, Sisselman participated with his father as managing partner of the family partnerships and had been appointed by H. Jerome to serve as trustee for the various family trusts, as president and trustee of the H. Jerome Sisselman Torah Foundation and as co-executor of his father's will. After H. Jerome's death, Sisselman also served as a managing partner of Sisselman Israel Associates. He remained a managing partner of Bergen County Associates until his ouster from *204 all the family partnerships in 1981. However, Sisselman continued serving as the president and trustee of the Torah Foundation and as the trustee of the Twenty-two Arnon Trust, the 1951 Lorraine R. Sisselman Trust and the 1963 H. Jerome and Lorraine R. Sisselman Trust.
As a result of the suits which had been filed against him, Sisselman approached plaintiff law firm in 1981 to secure legal representation. Prior to plaintiff's retention, Sisselman met to discuss the pending litigation with John J. Francis, Jr., Esq. (Francis) and Glenn S. Pantel, Esq. (Pantel), a partner and an associate, respectively, of the firm. It is Sisselman's recollection that:
[he] made clear to Shanley & Fisher right from the start that it was [his] position that the costs incurred in defending [his] role (for example, as trustee) would be borne by the trust itself, if (as subsequent events have shown) it was found that [his] management of same had been in good faith and reasonable. [He] took a similar position with respect to [his] management responsibilities to the partnerships. It was certainly [his] understanding that Shanley & Fisher's fees would, in large part, be billed to the partnerships, where the work was clearly to their benefit. [He] made this point many, many times during [his] conversations with counsel at Shanley & Fisher.

[He] understood that there would be some charges which were to run solely to [him], but the majority of the work related to the businesses. (Emphasis supplied).
Ultimately, Sisselman "retained plaintiff as counsel for himself, individually, and in his various capacities, on behalf of the trusts and as partner or managing partner of the subject partnerships." However, at the time of plaintiff's retention in 1981, no written retainer agreement was executed. Sisselman orally agreed to pay the hourly fees of plaintiff's attorneys, with the understanding that the litigation would be managed in an "economic" fashion. In accordance with this oral agreement, plaintiff proceeded to provide counsel to Sisselman in the pending matters. This representation began in 1981 and continued into 1983, with Sisselman receiving separate bills for each of the matters plaintiff was handling. These bills were sent in the form of monthly statements which described, in detail, the work performed. During this period, Sisselman never objected *205 to either the format, detail or allocation of the bills, and he did, in fact, make partial payment totaling $299,721.31 for legal services rendered. Sisselman maintains that these payments were made "from personal funds on behalf of the partnerships."
However, during the course of plaintiff's representation, Sisselman fell behind in the payment of legal fees. As a result of this problem, which Sisselman attributed to his lack of liquid assets, the parties began to discuss alternative payment arrangements. During these discussions, which continued for many months, plaintiff suggested that Sisselman could meet his obligations for legal fees by "signing over" his interest in various assets or partnership interests. In accordance with these suggestions, plaintiff presented Sisselman with several draft payment agreements, recommending that he review the agreements with independent counsel.
In the fall of 1981, Sisselman came to the conclusion that partition of the assets of the various partnerships was necessary for financial reasons. Accordingly, he asked plaintiff "to move for partition of at least some of the partnership assets in order to provide [him] with liquid assets, both with which to pay them, and upon which [he himself] could live." Partition, however, was not sought by plaintiff until April 1983. In the interim, plaintiff participated in various settlement discussions in pending Sisselman family matters.
In the fall of 1982, plaintiff advised Sisselman that if the firm was not paid additional counsel fees, it would be unable to continue to appear in the pending matters. In conjunction with this request for payment, on October 15, 1982 and November 24, 1982, plaintiff drafted payment agreements which provided that it would not withdraw as counsel if Sisselman executed a note to reflect his indebtedness to the firm and assigned to it a security interest in his assets. In addition, plaintiff suggested that in order to raise additional cash Sisselman mortgage his home in Livingston, New Jersey. He refused to do so or to *206 execute either of the payment agreements with which plaintiff had presented him. In December 1982, plaintiff's board of directors recommended that the firm withdraw as counsel in the Sisselman matters if a security interest was not granted to the firm.
On February 7, 1983, Francis had a proposed letter agreement hand-delivered to Sisselman for his signature and approval. This letter agreement was executed by Sisselman on February 8, 1983. In signing this document, Sisselman acknowledged that the fees and disbursements of plaintiff, rendered to date, were "fair and reasonable." He further acknowledged that he had "received independent legal advice on th[e] Agreement" and that "there [was then] due and owing to Shanley & Fisher, P.C. the sum of $289,702.34 for legal services rendered ... and disbursements [made] in connection therewith through December 31, 1982."
In consideration of Sisselman's acknowledgment of debt, plaintiff agreed "to forebear from seeking leave of [c]ourt to withdraw as [Sisselman's] attorney." It was further agreed that Sisselman would secure his obligation to pay this debt to plaintiff "by giving Shanley & Fisher, P.C. a security interest in all of the assets allocated to [him] by way of [c]ourt-ordered or [c]ourt-approved partition." However, if partition was not "ordered or approved by the [c]ourt within ten (10) days of the date of filing a motion ... seeking partition," then the parties agreed that plaintiff was free to seek leave of court to withdraw and to proceed to collect payment of the debt. The executed letter agreement was approved by plaintiff's board of directors on February 11, 1983.
Sisselman asserts that, after reading the letter agreement, he signed it without making alterations because "Shanley & Fisher threatened to withdraw from the case[s] on the eve of trial if [he] did not." Sisselman further maintains that he "was desperate to keep Shanley & Fisher in the cases" since it would have been impossible to retain new counsel and acquaint them *207 with the cases, in time for the pending trial date. On the other hand, plaintiff asserts that this letter, in its final form, had been:
repeatedly discussed, reviewed and revised in accordance with the conversations and correspondence occurring among John J. Degnan, Esq. and Glenn S. Pantel, Esq. on behalf of plaintiff, and Sisselman and Thomas Bruinooge, Esq., who provided independent counsel to Sisselman. The acknowledgment letter executed on February 8, 1983, reflected changes suggested and proposed by Sisselman.
Pursuant to the terms of the agreement, plaintiff moved for partition of the family partnership assets. However, these motions were denied by the trial court. Although plaintiff's involvement in the Sisselman matters subsequently became "negligible," Sisselman still wanted plaintiff to continue its representation. Accordingly, he suggested that an associate rather than a partner be employed so that "the billings would accumulate more slowly."
On March 17, 1983, plaintiff filed a notice of motion to withdraw from these matters pending in the Superior Court. However, after its filing, this motion was left pending for several months in light of attempts by various family members to finalize a settlement. Sisselman was represented in these negotiations by other counsel, and, at that time, plaintiff did not advise him at all with respect to settlement. In September 1983, plaintiff refiled the aforementioned motion and added an application for leave to withdraw as counsel in another matter. By order dated October 28, 1983, the trial court granted in its entirety the relief sought by plaintiff. Plaintiff previously had been relieved as counsel in another Sisselman matter pending in the United States District Court.
After withdrawing from each of the cases, plaintiff instituted this action in the Law Division, Essex County, seeking to recover $301,909.60 in fees for legal services rendered to Sisselman and to his wife, Deanna K. Sisselman, individually. In their answer, defendants alleged that plaintiff had never rendered Deanna K. Sisselman, individually, any services, nor had she agreed to assume any obligation therefor. Defendants *208 further claimed that any services rendered by plaintiff were performed for Sisselman, in his representative and/or fiduciary capacities or on behalf of various trusts, charitable foundations or partnerships. Moreover, defendants claimed that plaintiff had "committed overreaching in order to force [Sisselman] to sign" the letter agreement of February 7, 1983 and that the document, therefore, should be considered unconscionable, void and unenforceable.
Subsequently, the matter was transferred by consent to Bergen County. This transfer was made because the trial court in Bergen County had taken jurisdiction of all Sisselman family matters pending before the Superior Court in the Chancery and Law Divisions. The consent order specifically provided that the matter was being transferred to Bergen County for assignment to an arbitrator or special master who was to be empowered "to decide all issues raised in the action." During a hearing concerning other consolidated Sisselman matters, the trial court explained what a master, who was yet to be assigned, would be asked to do:
The [m]aster ... is to decide how much is due under the claims as they are made. If the claims are against Sisselman, he will determine how much is due from Selig Sisselman. He will not consider offsets .. . by virtue of any of the claims made in this case. He will just make a determination on the claims of the individuals for fees.... In other words, the question is did [Shanley & Fisher] bill to[o] much or did they bill for services not rendered to whatever [individual or entity] it's claimed against?
When pressed by attorneys for more specific information with regard to the scope of the master's duties and how the legal fees owed by the various Sisselman trusts and partnerships would be determined, the trial court further explained:
We will then, after the decision by the master examine the nature of the bills and services as I did with many other aspects and determine who should pay them ... I will not complicate my reference to the [m]aster [with] the approval of the Supreme Court by getting [him] into the hassle of going through these bills, item by item to determine who should pay [them].
These views were embodied in a pretrial order which combined this case with two other consolidated Sisselman matters *209 for purposes of determining claims for attorneys' fees. The order specifically provided that:

The reference to the [m]aster is to determine the appropriate quantum of the attorney fees sought and to indicate whether it is conceded as to which entity owes the money.... Any hearing required with respect to apportionment of the charges shall be the responsibility of the trial judge, not the Master, although the Master shall quantify the amounts in issue, if necessary.
In addition, the pretrial order set forth the following pertinent factual and legal contentions which were to be addressed by the master:
What is the fair and reasonable value of the services rendered by Shanley & Fisher, P.C.... the claim being that there is due and owing approximately $302,000, plus costs, etc.;
What is the legal effect of a letter agreement of February 7, 198[3] from John J. Francis, Jr. to Selig J. Sisselman ... and signed by Selig J. Sisselman, allegedly agreeing that approximately $290,000 of the fees were fair and reasonable and that he, Selig, had received independent legal advice in connection therewith.
With the approval of the Chief Justice, as required by R. 4:41-1, the trial court entered an order appointing a master and referring to him all matters set forth in the pretrial order "for hearing and determination."
However, before the master assumed the aforementioned responsibilities, plaintiff filed a notice of motion for partial summary judgment against Sisselman, individually, for $289,702.34 of the balance of $301,909.60 claimed to be due. In support of this motion, plaintiff relied upon the letter agreement, dated February 7, 1983 and executed on February 8, 1983, in which Sisselman acknowledged his debt to the firm in the amount of $289,702.34. Defendants thereafter filed a notice of omnibus cross-motion requesting, in part, that (1) plaintiff be ordered to provide discovery prior to the commencement of hearings before the master, and (2) partial summary judgment be entered for defendants, with respect to the validity of the "purported" acknowledgment letter of February 7, 1983.
Following argument on these motions, the trial court reserved decision on plaintiff's summary judgment application. *210 However, he specifically noted that, in light of those motions, the master's responsibilities would be modified as follows:
I am referring only one issue in Shanley and Fisher to the [m]aster to be handled informally . .. I am going to ask him for his opinion as to whether or not the hours spent and the services rendered as shown on the various bills and invoices serve as the basis for the quantum sought. That is all. Now, when I have that, I will rule on this motion. (Emphasis supplied).
* * * * * * * *

I advise [the special master]  and I'll put it on the record now  that he is to determine the fair and reasonable value of all of the services rendered; that he is to place upon the record the position of Selig Sisselman as to which portion he concedes is his and which portion he believes to be the third party. (Emphasis supplied).
* * * * * * * *

My direction is that there be a conference  [special master] present  informal  no record  everyone who wants to say anything they want to can say it to him. He runs it the way he wants to and he gives me his gut reaction as to the fair amount of work, the value of the work. (Emphasis supplied).
On the following day, the master held a preliminary informal hearing "for the purpose of determining whether or not the fee claims of plaintiff asserted in this action, to the extent covered by a certain letter dated February 7, 1983 ... appear[ed] to be within the parameters of reasonableness." After hearing the statements of the parties and considering computer printouts showing recorded time charges, as well as copies of bills, on April 25, 1985, the master issued a report in which he concluded:
It should be noted ... that on more than one occasion prior to this fee litigation, counsel for the defendant in moving papers or in open court acknowledged his client's satisfaction with the plaintiff's services. After listening to the preliminary statements of the parties, reviewing (on a sample basis) the billings submitted and considering the nature of the services, the degree of difficulty, the responsibility involved, the results achieved and the hourly rates charged, it is my threshold impression that the plaintiff's claims for fees are within the range of reasonableness. (Emphasis supplied).
Relying on this report, the trial court granted plaintiff's motion for summary judgment against Sisselman. It also denied that portion of Sisselman's omnibus cross-motion seeking discovery. Thereafter, Sisselman moved (1) to vacate the summary *211 judgment and (2) to compel plaintiff to provide defendants with a fee allocation breakdown and an explanation as to all legal invoices with respect to the legal services rendered on behalf of him, individually, and each partnership and trust. The motion was denied and this appeal followed.

I.
Defendants first contend that the trial court erred in granting summary judgment because there were genuine issues of material fact that required resolution by a plenary hearing. R. 4:46 permits a party to move for summary judgment at anytime. However, summary judgment is a stringent remedy and should not be granted unless the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact challenged and that the moving party is entitled to judgment as a matter of law. The moving party's burden on such a motion is to exclude all reasonable doubt as to the existence of any genuine issue of material fact. All inferences of doubt are drawn against the moving party and in favor of the opponent of the motion. The papers supporting the motion are closely scrutinized and the opposing papers indulgently treated. Judson v. Peoples Bank & Trust Co. of Westfield, 17 N.J. 67, 74-75 (1954); Brenner and Co. v. Perl, 72 N.J. Super. 160, 166 (App.Div. 1962). If there is the slightest doubt as to the existence of a material issue of fact, the motion should be denied. Garley v. Waddington, 177 N.J. Super. 173, 179 (App. Div. 1981); Linn v. Rand, 140 N.J. Super. 212, 216 (App.Div. 1976). See also United Advertising Corp. v. Metuchen, 35 N.J. 193, 195-196 (1961).
Summary judgment should not be granted where the adjudication of such a motion would constitute what is in effect a trial by affidavits on issues of fact. Although summary judgment serves the valid purpose in our judicial system of protecting against "groundless claims and frivolous defenses," *212 it is not a substitute for a full plenary trial. Moreover, the court should be particularly hesitant in granting summary judgment where questions dealing with subjective elements such as intent, motivation and duress are involved. Ruvolo v. American Cas. Co., 39 N.J. 490, 500 (1963); Judson, supra, 17 N.J. at 76; Exxon Corporation v. Wagner, 154 N.J. Super. 538, 541 (App.Div. 1977); Allen v. Planning Bd. Tp. of Evesham, 137 N.J. Super. 359, 363-364 (App.Div. 1975). In short, summary judgment should be denied unless the right thereto appears so clearly as to leave no room for controversy. Considered in this light, we are satisfied that the trial court's order granting plaintiff summary judgment was improper.
Our Supreme Court has recognized that when there has been moral compulsion sufficient to overcome the will of a person otherwise competent to contract, any agreement made under the circumstances is considered to be lacking in voluntary consent and therefore invalid. Rubenstein v. Rubenstein, 20 N.J. 359, 365 (1956). Thus, the legal concept of duress is based upon the "unreality of the apparent consent" of a contracting party. Id. at 366. In determining whether a contracting party is entitled to be absolved from his contractual obligations due to duress, the court must therefore look to the condition of the mind of the person subjected to coercive measures.
In the modern view, moral compulsion or psychological pressure may constitute duress if, thereby, the subject of the pressure is overborne and he is deprived of the exercise of his free will. The question is whether consent was coerced; that is, was the person complaining "induced by the duress or undue influence to give his consent, and would not have done so otherwise." [Ibid. (citing Williston on Contracts (rev. ed.) section 1604.) (Emphasis supplied)].
All attendant circumstances, including the age, capacity and relation of the parties, must be considered in determining whether a particular individual has been impelled to act by duress. In this respect, the test for duress is subjective, rather than objective, and does not turn on whether the duress is of "such severity as to overcome the will of a person of ordinary *213 firmness." S.P. Dunham & Co. v. Kudra, 44 N.J. Super. 565, 570 (App.Div. 1957). Moreover, in considering the merits of a claim of duress, "the exigencies of the situation in which the alleged victim finds himself" must be taken into account. Ross Systems v. Linden Dari-Delite, Inc., 35 N.J. 329, 336 (1961).
A party, however, will not be relieved of his contractual obligations, "in all instances where the pressure used has had its designed effect, in all cases where he has been deprived of the exercise of his free will and constrained by the other to act contrary to his inclination and best interests." Wolf v. Marlton Corp., 57 N.J. Super. 278, 286 (App.Div. 1959). Rather, "[u]nder the modern view, acts or threats cannot constitute duress unless they are wrongful." Id. at 287. Pressure may be considered wrongful when "it is so oppressive under given circumstances as to constrain one to do what his free will would refuse." Rubenstein, supra, 20 N.J. at 367 (citing First State Bank v. Federal Reserve Bank, 174 Minn. 535, 219 N.W. 908 (Sup.Ct. 1928)). In Continental Bank of Pa. v. Barclay Riding Acad., 93 N.J. 153, 177 (1983), cert. den., sub nom., Barclay Equestrian Center, Inc. v. Continental Bank of Pennsylvania, 464 U.S. 994, 104 S.Ct. 488, 78 L.Ed.2d 684 (1983), our Supreme Court reaffirmed this principle, stating:
We adhere today to our previous statement of the law of duress in West Park Ave. [Inc. v. Ocean Tp., 48 N.J. 122] that the "decisive factor" is the wrongfulness of the pressure exerted. The term "wrongful" in this context encompasses more than criminal or tortious acts, Miller v. Eisele, 111 N.J.L. 268, 276 (E. & A. 1933), for conduct may be legal but still oppressive. As the Appellate Division rightly observed in Wolf v. Marlton Corp., 57 N.J. Super. 278, 287 (1959), "[w]e have come to deal, in terms of the business compulsion doctrine, with acts and threats that are wrongful, not necessarily in a legal, but in a moral or equitable sense."
The state of mind which would induce an individual to act under duress may be proved by his own direct testimony. Rubenstein, supra, 20 N.J. at 368. In fact, the only way such a state of mind may be delved into and challenged is through examination and cross-examination. Thus, in order for the trial court to have properly ascertained if duress played any part in Sisselman's execution of the February 7, 1983 letter agreement, *214 a full plenary hearing was necessary. As with any issue of credibility, this matter should not have been resolved in summary fashion. Judson, supra, 17 N.J. at 75-76.
Moreover, due to the claimed duress, a factual issue was presented here with respect to the enforceability of the February 7, 1983 agreement. Although plaintiff alleged that the agreement was discussed with and executed by Sisselman with the full knowledge and advice of his attorney, Bruinooge, Bruinooge alleged that he was uninvolved in the negotiations, drafting or preparations of the same. Furthermore, while the affidavit of John J. Degnan, Esq. (Degnan), a partner in the plaintiff firm, states that "on February 8, 1983, the very date that the acknowledgment was ultimately executed by Mr. Sisselman, discussions were conducted as to insure that Mr. Sisselman was fully apprised of his acknowledgment's implications," Sisselman certified that he executed the acknowledgment letter "only because Shanley & Fisher threatened to withdraw from the case on the eve of trial" and with the understanding that he was only guaranteeing the partnership obligations.
Consequently, the trial court erred in determining, as a matter of law and without the benefit of a plenary hearing, that the subject "settlement was a valid and binding one and ... the claims of undue influence.... [were] contrived." Thus, the matter must be remanded to the trial court for further proceedings to determine whether or not Sisselman's will was actually overborne at the time he executed the February 7, 1983 letter agreement and whether or not plaintiff's threatened withdrawal from representation was wrongful. It is only after these factual issues have been fully considered that a proper legal determination as to the validity and enforceability of the agreement may be made.
In addition, there was an issue of fact raised concerning the reasonableness of the fees sought by plaintiff. In considering plaintiff's motion for partial summary judgment, the trial court appears to have recognized the existence of this issue, stating:

*215 [T]he only issue I see is ... a large disparity between the fair and reasonable value of all of the services and [plaintiff's] total billing.
* * * * * * * *
The question is whether or not the consideration of services justifies an ultimate fee of approximately $300,000.00 on a summary judgment....
These comments highlight the fact that the trial court misconceived the judicial function in a summary judgment proceeding and improperly decided the motion from conflicting proofs. See Judson, supra, 17 N.J. at 73 (trial court's proper role is to determine whether there is a genuine issue as to a material fact but not to decide the issue if it is found to exist).
We are convinced from our study of the record that plaintiff failed to exclude all reasonable doubt as to the existence of genuine material factual issues. Thus, a plenary hearing was required and the summary disposition of the matter improper.

II.
We are also satisfied that the trial court erred in denying defendants' motion for pretrial discovery directed to plaintiff's claim for legal fees. With respect to discovery matters, our court rules generally provide that:

Parties may obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action, whether it relates to the claim or defense of the party seeking discovery or to the claim or defense of any other party, including the existence, description, nature, custody, condition and location of any books, documents, or other tangible things and the identity and location of persons having knowledge of any discoverable matter. It is not ground for objection that the information sought will be inadmissible at the trial if the information sought appears reasonably calculated to lead to the discovery of admissible evidence; nor is it ground for objection that the examining party has knowledge of the matters as to which discovery is sought. [R. 4:10-2(a) (Emphasis supplied)].
This discovery provision is part of our civil practice rules which recognize that "[l]iberal procedures for discovery in preparation for trial are essential to any modern judicial system in which the search for truth in aid of justice is paramount and in which concealment and surprise are not to be tolerated." Lang v. Morgan's Home Equipment Corp., 6 N.J. 333, 338 (1951).
*216 Accordingly, our courts have held that rules of discovery are to be liberally construed and accorded the broadest possible latitude. Blumberg v. Dornbusch, 139 N.J. Super. 433, 437-438 (App.Div. 1976). Such liberal construction allows the court to compel a party to produce all relevant, unprivileged information which may lead to the discovery of relevant evidence concerning the respective positions of both plaintiff and defendant. Huie v. Newcomb Hospital, 112 N.J. Super. 429, 432 (App.Div. 1970); Rogotzki v. Schept, 91 N.J. Super. 135, 146 (App.Div. 1966); Van Langen v. Chadwick, 173 N.J. Super. 517, 524-525 (Law Div. 1980) (citing R. 4:10-2(a)).
The discovery rules are also designed to insure that the ultimate outcome of litigation will be dependent on the merits of an individual matter in light of all the available facts. Resolution of a case should not hinge upon "the craftiness of the parties or the guile of their counsel." Lang, supra, 6 N.J. at 338. As this court stated in Interchemical Corp. v. Uncas Printing & Finishing Co., Inc., 39 N.J. Super. 318, 325 (App. Div. 1956), the discovery rules which have been promulgated by the Supreme Court:
displaced what ha[d] been called the "sporting" concept of a law action which all too often characterized the former practice. They inaugurated a permanent open season on facts. The purpose of the broad discovery now provided by our rules is to give a party "a wide latitude in securing such discovery as he may need concerning the details of the evidence so that the outcome of the case will depend less upon surprise testimony and the maneuverings of counsel and more upon the merits of the issues."
See also Polulich v. J.G. Schmidt Tool Die & Stamping Co., 46 N.J. Super. 135, 144 (Cty.Ct. 1957) (recognizing that our discovery rules have emphatically rejected "the sporting theory of justice").
Since "[o]ur court system has long been committed to the view that essential justice is better achieved when there has been full disclosure so that the parties are conversant with all the available facts," Jenkins v. Rainner, 69 N.J. 50, 56 (1976), we are satisfied that the trial court erred in denying defendants the right to discovery with respect to plaintiff's claim for legal *217 fees. Upon remand, both parties should therefore be afforded the opportunity for full and complete discovery on all issues, including those relating to (1) the reasonableness of the fees charged by plaintiff for legal services rendered to Sisselman, individually and as trustee and partner of the other named defendants; (2) Sisselman's responsibility to pay for legal services provided on behalf of all defendants; and (3) the alleged duress in the execution of the February 7, 1983 letter agreement. We direct the trial court to set a schedule for the completion of such discovery on an expedited basis.

III.
Accordingly, summary judgment under review is reversed and the matter is remanded to the trial court for further proceedings consistent with the views expressed in this opinion. We do not retain jurisdiction.