707 A.2d 1357

YVETTE M. CARMICHAEL, PLAINTIFF–APPELLANT, AND GERALD CARMICHAEL, PLAINTIFF, v. JOSEPH B. BRYAN AND DAVID M. STOUT, DEFENDANTS–RESPONDENTS.

Superior Court of New Jersey
Appellate Division

Submitted February 25, 1998—Decided March 17, 1998.

Before Judges A.A. RODRIGUEZ and COBURN.

*Franc J.H. Marmero*, attorney for appellant (*David R. York*, on the brief).

*Green, Lundgren and Ryan*, attorneys for respondents (*Laurence T. Bennett*, on the brief).

The opinion of the court was delivered by

COBURN, J.A.D.

This appeal concerns two issues: whether the court, in granting summary judgment to defendant, erred (1) in finding that plaintiff was subject to the New Jersey verbal threshold statute, *N.J.S.A.* 39:6A–8, for her failure to abide by the compulsory automobile insurance coverage statute, *N.J.S.A.* 39:6A–3; and (2) in determining that her injuries were not sufficiently severe to satisfy the requirements of the verbal threshold statute.

At about 2:30 p.m. on May 27, 1993, plaintiff was operating a motor vehicle owned by her father-in-law, James E. Carmichael (James) in Lindenwold. While at a complete stop, waiting to make a left hand turn, her vehicle was struck in the rear by a vehicle driven by defendant Bryan. In his insurance policy, James had selected the "Zero Threshold Option."

Plaintiff certified that at the time of the accident, she had two inoperable, uninsured "vehicles register[ed] to [her] name," a 1976 Ford Maverick and a 1979 Mercury Capri, which were stored at her father-in-law's farm.

James, a working mechanic/technician for the last eighteen years, certified that the Ford had been towed to his property after an accident in the late 1980's that rendered the vehicle "inoperable due to numerous problems including but not limited to front end damage, damage to suspension and the need for body work." He stated, "At no time was this vehicle either operable or 'on the road' at any time from the time of the aforementioned automobile accident until after May 27, 1993." James certified that the Mercury had been "stored" on his property for nearly six years prior to May 27, 1993, due mainly to a problem with the fuel system. He stated further that the vehicle had not been operable during the six years prior to the accident, and that it "was eventually put back on the road shortly after May 27, 1993."

James further explained that as a result of plaintiff's May 27 accident, his vehicle was "totalled" and it "became an immediate priority and somewhat of an emergency to get one of the two aforementioned vehicles operable and on the road," as he was "without a vehicle and [his] son and [his] wife could no longer borrow [his] vehicle to run errands, etc." He stated that prior to the accident, repair of the vehicles was not a priority and that there were no immediate plans to put either vehicle back on the road.

However, according to plaintiff, she had "spoken to an insurance agent *the night before the accident,*" with the intent of insuring both vehicles that night. (Emphasis added). She arrived at the agency "after business hours were over" and was unable to make payment. Although neither of the vehicles were running at the time, she stated that "[they] were hoping they would be soon."

At 8 p.m. on May 27, 1993, about five and a half hours after the car accident, plaintiff and her husband, Gerald Carmichael, signed a contract for insurance in which they selected the verbal threshold option insuring the Ford and the Mercury. Plaintiff testified that her father-in-law thereafter repaired the two cars. The Mercury was being driven "sometime in June" while the Ford was first driveable "about the first week in July."

With respect to her injuries from the collision, plaintiff maintained that she hit her head on the steering wheel during impact. Soon thereafter, she was taken by ambulance to Kennedy Memorial Hospital in Stratford, where she complained of headaches and pain in her left arm. Nurses notes taken at that time indicate that she denied "any neck, back, chest or [abdominal] pain." Emergency room doctors released plaintiff with instructions to follow-up with her family physician.

At her attorney's referral, plaintiff sought treatment from Dr. Dennis Scardigli on June 1, 1993. She complained of headaches, dizziness, low back pain, neck pain radiating into the left arm, right groin pain, and right leg pain. An examination revealed a forty percent range of motion in the neck accompanied by paravertebral muscle spasm. Bilaterally, the trapezius was tender and associated with spasm as well as tenderness along the entire cervical spinous processes. The lumbar spine revealed tenderness, muscle spasm and a loss of range of motion of forty percent. In addition, the plaintiff's right calf was positive for homans sign. Dr. Scardigli's initial diagnosis was concussion, tenderness of the right groin, cervical sprain associated with radicular symptoms, lumbosacral sprain, and possible phlebitis of the right calf. He opined that plaintiff's injuries were directly related to the May 27, 1993, motor vehicle accident and that it would be "inadvisable" for her to return to work. X-rays were not performed because the plaintiff was approximately ten days late for her menses at the time.

On June 7, 1993, plaintiff was evaluated by Jeffrey A. Gold, Ph.D., to determine whether she was experiencing any psychological difficulties as a result of the accident. At the time of this examination, the plaintiff was experiencing anxiety, irritability, phobic responses and headaches on a daily basis, approximately two times a day. Dr. Gold performed psychological testing which revealed a moderate range of depression and significant emotional distress and anxiety. His diagnosis of plaintiff at this time was, "Adjustment Reaction with mixed Emotions" and "Post Traumatic

Stress Disorder." He recommended that plaintiff undergo compu-
terized biofeedback and self-regulation training to enable her to
gain control over chronically tense muscles.

On June 23, 1993, plaintiff was evaluated by Eby L. Banas,
M.D., for a neurological consultation. At this time, the plaintiff
offered complaints of headaches, dizziness, neck pain, lower back
pain, right calf pain, left forearm pain and pain with numbness in
her left hand and fingers. Dr. Banas' physical examination re-
vealed paravertebral muscle spasm and tenderness in both the
cervical and lumbar regions. His initial diagnosis was "post
traumatic headaches, post traumatic syndrome, cervical strain,
lumbosacral strain, right calf contusion, [rule out] right lumbar
radiculopathy, left cervical radiculopathy, [rule out] carpal tunnel
syndrome." He recommended that plaintiff continue physical
therapy with Dr. Scardigli and advised against X-rays, MRI and
medication because plaintiff was pregnant.

During her course of treatment, plaintiff regularly sought OB/
GYN evaluations at Kennedy Memorial Hospital. On July 29,
1993, due to difficulties with the pregnancy, plaintiff underwent
surgery at the hospital. At this time, a successful McDonald
Cerclage was performed, and plaintiff was predominately confined
to bed rest until mid-December when she delivered. Reports
taken prior to the surgery indicate that while plaintiff had right
groin pain, she demonstrated normal neurologic and musculoskele-
tal findings, with "no physical limitations." Progress notes taken
by hospital staff further reveal that while plaintiff reported pain in
her back on November 12, 1993, she denied headaches or any
other physical ailments during a post partem examination on
February 3, 1994.

On February 14, 1994, plaintiff returned to Dr. Scardigli for
physical therapy. At this time, she was complaining of "horrible"
back pain. Dr. Scardigli's physical examination revealed that the
range of motion of the neck "approximates 70% associated with
symptoms," while the range of motion of the lower back "approxi-

mates 60%." Dr. Scardigli placed plaintiff on Ansaid and recommended that she continue with physical therapy twice a week.

In August of 1994, plaintiff sought treatment with Robert Cavallaro, D.C. She complained of "headaches, neck pain and stiffness, pain in the mid to lower back extending along the bilateral lumbosacral flanks and pain down the right arm into the right hand and wrist." She also reported feeling "fatigued, depressed, irritable, nervous and tense." Dr. Cavallaro's physical examination of plaintiff revealed decreased range of motion in the cervical and lumbar spine. Specifically, he found the following:

Palpation of the cervical musculature reveals muscle spasm from C3 to C7 bilaterally. The patient is stiff and guarded upon all ranges [of] motion. The bilateral SCM's and trapezii are rigid and spastic. Examination of the bilateral, suboccipital and trapezial ridges reveals trigger point tenderness on both sides. . . . The musculature of the mid and lower back is spastic and rigid from T3 to T7 including the rhomboids, levator scapula and supraspinatus musculature.

X-rays taken on August 4, 1994, revealed "a loss of the normal lordotic cervical curve with aberrant spinal biomechanics in both flexion and extension at the atlanto-occipital junction." A surface EMG performed on September 9, 1994, demonstrated hypertonicity in the area of C2. Range of motion testing performed on September 15, 1994, revealed decreased ranges of motion in the cervical and lumbar spine in flexion and extension.

Dr. Cavallaro's diagnosis was, "acute/chronic post traumatic cervical strain and sprain; chronic post traumatic cervicogenic cephalgia; acute/chronic post traumatic thoracic strain and sprain; acute/chronic post traumatic lumbar strain and sprain; bilateral sciatic neuritis; post traumatic cervical, thoracic and lumbar myofascitis; bilateral suboccipital and trapezial trigger points." His impression was that the injuries sustained by the plaintiff were as a direct result of the motor vehicle accident of May 27, 1993. His recommendation was that plaintiff continue conservative chiropractic care and home rehabilitative exercises.

Plaintiff was thereafter evaluated by Marc L. Kahn, M.D., on September 1, 1994. Dr. Kahn's physical examination of the plaintiff revealed restriction in the range of motion of the cervical spine

to seventy-five to eighty percent of normal as well as tenderness with palpation in the midline and adjacent paracervical areas extending laterally into the trapezial musculature. Examination of the lumbosacral spine revealed ranges of motion restricted to approximately seventy-five to eighty percent of normal with pain and guarding at the extremes. Palpation elicited tenderness and protective spasm in the midline and adjacent paravertebral musculature throughout the lumbar spine. A straight leg raise test was positive bilaterally at approximately forty to forty-five degrees with pain referred to lower back.

Dr. Kahn's diagnosis was of acute traumatic cervical and acute traumatic lumbosacral sprain and strain. He found the above noted injuries to be a direct result of the May 27, 1993, motor vehicle accident and recommended that the plaintiff continue with chiropractic care and physical therapy, as well as the use of anti-inflammatory agents and avoid any strenuous activity.

Since October of 1994, plaintiff has lived in Maryland and, as stated in her deposition on October 17, 1995, has altogether ceased treatment for her injuries. She maintained that she still experienced pain in her back and neck and consequently could not take part in a number of recreational activities that she once enjoyed such as playing basketball, jogging, aerobics and bowling. She also complained of the inability to read or sit in front of her computer at her data entry job for prolonged periods of time due to discomfort and stiffness in the neck.

## I.

Plaintiff contends that the trial court erred in granting the defendant's motion for summary judgment by determining that plaintiff was subject to *N.J.S.A.* 39:6A–8(a), the verbal threshold. She argues that New Jersey law does not mandate inoperable vehicles to be insured and, because a rational jury could determine that her vehicles were in fact not operable, summary judgment in this case was not appropriate.

The relevant statutes are found in the New Jersey Automobile Reparation Reform Act, *N.J.S.A.* 39:6A–1 to –35. In particular, *N.J.S.A.* 39:6A–4.5 states, in pertinent part, the following:

> Any person who, at the time of an automobile accident resulting in injuries to that person, is required but fails to maintain medical expense benefits coverage mandated by section 4 of P.L.1972, c. 70 (C. 39:6A–4) shall:
>
> a. For the purpose of filing an action for recovery of noneconomic loss, as defined in section 2 of P.L.1972, c. 70 (C. 39:6A–2), be subject to the tort option specified in subsection a. of section 8 of P.L.1972, c. 70 (C. 39:6A–8).

*N.J.S.A.* 39:6A–3 speaks to the issue of who must maintain the required insurance coverage:

> *Every owner or registered owner of an automobile registered or principally garaged* in this State shall maintain automobile liability insurance coverage....
>
> [Emphasis added.]

The initial question is whether these provisions are meant to apply to owners of vehicles that are not operable.

The language of *N.J.S.A.* 39:6A–3, read literally, would require *any* owner or registered owner of a vehicle "registered or principally garaged" in New Jersey to maintain minimum medical expense benefit coverage. As such, the issue of whether a vehicle is "operable" on the date of the subject accident would be of no consequence to the determination of whether the owner was subject to the verbal threshold. However, although the words used are normally a reliable indicator of a statute's meaning, the courts of New Jersey have consistently recognized that the purpose or aim of the statute is the " 'surest guide' " to their proper interpretation. *State v. De Vincenzo*, 189 *N.J.Super.* 201, 203–04, 459 *A.*2d 710 (Law Div.1983) (citations omitted). Accordingly, an accurate interpretation of this legislation requires an understanding of its objectives.

Since the New Jersey Automobile Reparation Reform Act has been enacted, several cases have been decided which, though not addressing the particular statutes at issue here, shed light on the legislative intent behind statutes requiring an owner's vehicles to be insured as a condition of eligibility for various benefits. *See, e.g., Lilly v. Prudential Ins. Co.*, 246 *N.J.Super.* 357, 587 *A.*2d 672

(Law Div.1990), *aff'd o.b.*, 246 *N.J.Super.* 280, 587 *A.*2d 629 (App.Div.1991) (PIP benefits could not be denied to owner of uninsured operable automobile placed in storage prior to accident); *Caldwell v. Kline*, 232 *N.J.Super.* 406, 557 *A.*2d 661 (App. Div.1989) (owner of temporarily inoperable vehicle excluded from recovery under the Unsatisfied Claim and Judgment Fund); *Kennedy v. Allstate Ins. Co.*, 211 *N.J.Super.* 515, 511 *A.*2d 1301 (Law Div.), *aff'd*, 213 *N.J.Super.* 137, 516 *A.*2d 1117 (App.Div.1986) (claimant excluded from PIP coverage benefits under another's insurance where claimant operated his uninsured vehicle up until time of accident). Perhaps the most useful guidance in this area comes from the Supreme Court in *Foxworth v. Morris*, 134 *N.J.* 284, 633 *A.*2d 536 (1993), a case involving eligibility for payment under the Unsatisfied Claim and Judgment Fund (Fund), *N.J.S.A.* 39:6–70.

*N.J.S.A* 39:6–70(d) requires that in order for an injured person to be eligible to collect benefits from the Fund, he must not be "at the time of the accident, the owner or registrant of an uninsured motor vehicle . . . ." With respect to the statute's construction, the *Foxworth* Court made the following statement:

> At first glance, the present language of the statute would appear to create an absolute bar to recovery. We are uncertain, however, that the Legislature intended that. Consider, for example, the case of a person who has bought a used car, given the cash-purchase price to the seller, received the bill of sale, and returned home to arrange for insurance, registration, and license plates. At that point no one can drive the car until the owner has obtained plates, which the owner cannot do without proof of insurance. That person is, however, the owner of an uninsured motor vehicle. If that person were involved in an accident with an uninsured motorist, a literal reading of the Act would prohibit Fund benefits. We do not believe that the Legislature would intend that a perfectly well-intentioned motorist, who has followed the letter of the law, should be deemed ineligible for Fund benefits merely because of the status of ownership. Our task is to have the law make sense: "it is a venerable principle that a law will not be interpreted to produce absurd results." We " 'effectuate the legislative intent [of the law] in light of the language used and the objects sought to be achieved.' " If, then, some conceptual window is found between the status of ownership and the status of disqualifying noncompliance with the requirements of law, our task is to decide how the Legislature would define that window.

> [*Id.* at 287–88, 633 *A.*2d 536 (citations omitted).]

In *Foxworth*, the plaintiff, a passenger injured in a motor vehicle accident involving two uninsured automobiles, had purchased an inoperable 1976 Saab several months prior to the accident. 134 *N.J.* at 286, 633 *A.*2d 536. He had no insurance on the Saab. *Ibid.* While the Court found that plaintiff intended to eventually repair and operate the vehicle, it acknowledged that he claimed he never drove the vehicle, that he had stored the car from the time of purchase, and that he ultimately "junked it." *Id.* at 290, 633 *A.*2d 536. The Court noted that the record did not resolve whether plaintiff had registered the vehicle and obtained license plates. *Ibid.*

Determining that the Appellate Division had erred in concluding that to maintain Fund eligibility an owner under the statute must insure an inoperable and unregistered car, the Court recognized that the legislation "had to be construed in light of its purpose." *Id.* at 289, 633 *A.*2d 536. "The problem," it identified, "is defining the point at which 'there can be no concern of injury by a financially irresponsible or uninsured motorist.'" *Ibid.* (quoting *Caldwell, supra,* 232 *N.J.Super.* at 412, 557 *A.*2d 661). The Court explained:

> [W]hen one has taken a vehicle off the road with no intention of operating the uninsured vehicle, disqualification under *N.J.S.A.* 39:6–70(d) would "extend its scope beyond that intended by the Legislature." 232 *N.J.Super.* at 412, 557 *A.*2d 661. "Without the intent to operate and without registration and license plates, the vehicle could be no danger to anyone." *Ibid.*
>
> [*Id.* at 290–91, 633 *A.*2d 536 (quoting *Caldwell, supra,* 232 *N.J.Super.* at 412, 557 *A.*2d 661).]

The Court further explained that although the owner need not show an intent to abandon the vehicle, he must demonstrate that "there was no intention to make the vehicle operable in the immediate future after acquisition or withdrawal from the road, and present competent proof that the basis for inoperability was substantial." *Id.* at 291, 633 *A.*2d 536. The court noted as an example that a vehicle that is inoperable because it has no battery would not meet the test. *Id.*

The Court reversed the judgment of the Appellate Division denying plaintiff's motion for Fund benefits and remanded the case to the Law Division with the following instructions:

> Plaintiff shall be required to show by competent evidence that substantial repairs were required in order to make the vehicle operable, that he did not intend to operate the vehicle in the period immediately following its acquisition or at any time before it was insured, and, finally, that his ownership presented no public concern for danger of injury by an uninsured motorist.
>
> [*Id.* at 291, 633 *A.*2d 536.]

With respect to the issue of whether plaintiff's Saab was registered at the time of the accident, the Court noted that "[b]ecause registering a car in New Jersey without certifying that insurance is in effect is not possible, any registration would have been fraudulent. *N.J.S.A.* 39:6B–1." *Id.* at 290, 633 *A.*2d 536. Accordingly, if the trial court should find any such misconduct was committed by plaintiff on the registration application to the Division of Motor Vehicles, such misconduct "could demonstrate that [plaintiff's] ownership of the vehicle did present a danger to the motoring public." *Id.* at 291, 633 *A.*2d 536.

Further insight into the legislative purpose behind the statutes mandating automobile insurance coverage is provided by the line of cases interpreting *N.J.S.A.* 39:6A–7b(1). This provision permits the exclusion from "section 4 and section 10 benefits" any injured person who at the time of the accident "was the owner or registrant of an automobile registered or principally garaged in this State that was being operated without personal injury protection coverage.... "

In *Kennedy v. Allstate Ins., Co., supra,* 211 *N.J.Super.* at 520, 511 *A.*2d 1301, the court, in construing *N.J.S.A.* 39:6A–7b(1), held that the legislature intended "to exclude one from the benefits of PIP coverage under another's insurance policy when the claimant has failed to obtain PIP coverage for his own vehicle as required by law." The court noted in that case the plaintiff had "admitted during depositions that he had operated his vehicle up until the time of the accident." *Id.* at 518, 511 *A.*2d 1301. In *Lilly v. Prudential Ins. Co., supra,* 246 *N.J.Super.* at 359–62, 587 *A.*2d

672, the court went on to further interpret *N.J.S.A.* 39:6A–7b(1), concluding that PIP benefits could not be denied to owners who have stored their uninsured motor vehicles because they do not wish to operate them. In support of its position, the *Lilly* court relied upon the rationale expressed in *Caldwell, supra:*

> "An owner without an intent to operate his vehicle, whether it be because of temporary inoperability or otherwise, is not the type of person the Legislature wanted to exclude. Without the intent to operate and without registration and license plates, the vehicle could be no danger to anyone. Moreover, when the absence of insurance is the result of a decision to remove the vehicle from operation, there can be no concern of injury by a financially irresponsible or uninsured motorist."
>
> [246 *N.J.Super.* at 361, 587 *A.2d* 672 (quoting *Caldwell v. Kline,* 232 *N.J.Super.* at 412, 557 *A.2d* 661).]

Most recently, in *Gibson v. New Jersey Mfrs. Ins. Co.,* 261 *N.J.Super.* 579, 619 *A.2d* 636 (App.Div.1993), the court acknowledged that the exclusion of all claimants without PIP coverage on their owned or registered vehicles goes beyond the intent of the legislature and that the issue really centers on "the intent of the owner with regard to operation of the vehicle in or around the time of the accident." *Id.* at 583–85, 619 *A.2d* 636.

In light of the aforementioned cases, it is clear that *N.J.S.A.* 39:6A–4.5 and *N.J.S.A.* 39:6A–3, the statutes at issue in this case, are not meant to apply to owners of vehicles which are not operable at the time of the accident so long as there was no intent to operate them in or around that time. This reading of the statute is consistent with the interpretations of similarly worded statutes discussed above and most accurately reflects the purpose of the legislature as suggested by the *Foxworth* holding and others. A vehicle that is not, and will not be in the immediate future, operated on the roadways poses no danger "of injury by a financially irresponsible or uninsured motorist." *Caldwell v. Kline, supra,* 232 *N.J.Super.* at 412, 557 *A.2d* 661. Accordingly, in those instances where the owner's intent not to operate his uninsured motor vehicle is manifest, *see Lilly v. Prudential Ins. Co., supra,* 246 *N.J.Super.* at 360, 587 *A.2d* 672, the owner is not required to maintain automobile insurance coverage under

*N.J.S.A.* 39:6A–3 and should not be subject to the verbal threshold under *N.J.S.A.* 39:6A–4.5.

In the context of this case, the next question is whether the trial court erred in finding, on a motion for summary judgment, that the plaintiff was subject to the verbal threshold. Summary judgment must be granted if "the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law." *R.* 4:46–2(c). In *Brill v. Guardian Life Ins. Co. of Am.*, 142 *N.J.* 520, 666 *A.*2d 146 (1995), the Court articulated the standard for determining whether there is a genuine issue of fact. The judge must decide whether "the competent evidential materials presented, when viewed in the light most favorable to the nonmoving party, are sufficient to permit a rational fact-finder to resolve the alleged disputed issue in favor of the non-moving party." *Id.* at 540, 666 *A.*2d 146. Summary judgment is not available where "the adjudication of such a motion would constitute what is in effect a trial by affidavits on issues of fact." *Shanley & Fisher, P.C. v. Sisselman,* 215 *N.J.Super.* 200, 211, 521 *A.*2d 872 (App.Div.1987). Moreover, a court should be "particularly hesitant" to apply the summary judgment model when dealing with a "subjective element[ ] such as intent." *Id.* at 212, 521 *A.*2d 872.

In *Gibson v. New Jersey Mfrs. Ins. Co., supra,* we had occasion to relate the principles of summary judgment in the context of a case involving the same issue of intent as the subject case. These pertinent remarks appear in that opinion:

> We recognize the difficulty of enforcing the exclusion in circumstances where the issue centers on the intent of the owner with regard to operation of the vehicle in or around the time of the accident. However, issues of subjective intent are often presented to the fact finder in our court system, both in criminal and civil cases. An examination of the surrounding facts and circumstances is required in such an undertaking. The dispute is a factual one which generally cannot be decided based merely upon review of affidavits, certifications, or pleadings. The Law Division judge here erred in concluding on the papers that "the factual picture here does not warrant the findings of non-intent to operate the motor vehicle."

> We hold that when an insurer comes forward with proof that the owner or registrant of an automobile registered or principally garaged in this State, who is seeking PIP benefits lacks PIP coverage, a *prima facie* case of exclusion has been established. The PIP claimant must then come forward and show that the vehicle was not being operated in or around the time of the accident, based on a conscious determination to prevent use of the uninsured vehicle as demonstrated by the conduct of the owner or registrant. Although the burden of producing evidence that the vehicle was purposely not being operated shifts to the claimant, the ultimate burden of persuasion as to the appropriateness of the exclusion should not shift from the insurer.
>
> [*Id.* at 585–86, 619 *A.2d* 636 (citation omitted).]

As in *Gibson,* the judge in this case decided the issue of intent based on certifications and deposition testimony without the benefit of a plenary hearing. Although there was evidence to support the judge's conclusion, there was also evidence the other way, some of which was not mentioned by the judge. For example, the plaintiff testified at her deposition that she had attempted to insure the Ford and the Mercury "the night *before* the accident." (Emphasis added). Unfortunately, the insurance agency was closed when she arrived. A reasonable fact-finder could determine, based on that fact alone, that she had no intent to operate those vehicles without the appropriate insurance.

There was evidence that the vehicles were "registered," but the record is unclear with respect to when the registration took place. In other words, it may be that when the license plates which apparently were still on the vehicles (a point not actually resolved by the presentations below) were obtained, the vehicles were insured; and it was only after the vehicles were stored that the insurance was permitted to lapse. In other words, this may not be a case in which the plaintiff had obtained registration fraudulently, an issue touched upon by the *Foxworth* Court. 134 *N.J.* at 290–91, 633 *A.2d* 536.

There was also unrebutted evidence that the vehicles had been stored in an inoperable state for over four years. That would suggest that the basis for inoperability was "substantial," *Foxworth, supra,* 134 *N.J.* at 291, 633 *A.2d* 536, a point buttressed by the testimony that the vehicles were not rendered operable until sometime in June for the Mercury and sometime in July for the

Ford. The length of the storage was also important evidence on the question of the lack of intent to make the vehicles operable after their withdrawal from the road. *Ibid.*

The judge concluded that the "inoperability of those vehicles [was] such ... that they were certainly capable of being repaired and placed into immediate operation." The basis for that conclusion is unstated. The accident happened on May 27, 1993. Although the plaintiff's father-in-law certified that he needed at least one of the vehicles immediately, the repairs were not completed until sometime in June. Thus, at a minimum there should have been recognition that this case did not involve a repair as simple as replacing a battery, an example given by the *Foxworth* Court of the kind of needed repair which would be recognized as so insubstantial that it did not result in a vehicle being inoperable. *Ibid.*

In short, this case presented a genuine issue of material fact, the intent of the plaintiff at various times, which ought not to have been resolved on a motion for summary judgment. Plaintiff was entitled to testify and have her credibility determined. *Underwood v. Atlantic City Racing Ass'n,* 295 *N.J.Super.* 335, 343, 685 *A.*2d 40 (App.Div.1996), *certif. denied,* 149 *N.J.* 140, 693 *A.*2d 110 (1997).

On remand, the determination will have to be made after a plenary hearing. Since this aspect of the case is clearly statutory, the issues shall be resolved by the judge as fact-finder. *Cf. Manetti v. Prudential Property & Cas. Ins. Co.,* 196 *N.J.Super.* 317, 320–21, 482 *A.*2d 520 (App.Div.1984).

Since the motion judge has expressed opinions regarding the plaintiff's intent in the process of weighing the evidence and may have a commitment to his findings, we conclude that it is appropriate the matter be assigned another judge. *In re Guardianship of R.G. and F.,* 155 *N.J.Super.* 186, 195, 382 *A.*2d 654 (App.Div.1977); *New Jersey Div. of Youth and Family Services v. A.W.,* 103 *N.J.* 591, 617, 512 *A.*2d 438 (1986).

## II.

Plaintiff argues that even if she was properly subjected to the verbal threshold, the trial court erred in granting the motion for summary judgment on the issue that she failed to meet its requirements. The trial court's reasons as to why plaintiff's injuries did not meet the verbal threshold were not made part of the record. Nonetheless, our review of the evidence shows that plaintiff's argument is clearly without merit.

Under the verbal threshold, an injured person cannot maintain a civil suit for noneconomic damages against a tortfeasor in an automobile accident unless that person has sustained a personal injury which results in:

> death; dismemberment; significant disfigurement; a fracture; loss of a fetus; permanent loss of use of a body organ, member, function or system; permanent consequential limitation of use of a body organ or member; significant limitation of use of a body function or system; or a medically determined injury or impairment of a non-permanent nature which prevents the injured person from performing substantially all of the material acts which constitute that person's usual and customary daily activities for not less than 90 days during the 180 days immediately following the occurrence of the injury or impairment. . . .
>
> [*N.J.S.A.* 39:6A–8a.]

In *Cavanaugh v. Morris*, 273 *N.J.Super.* 38, 640 *A.*2d 1192 (App.Div.1994), the court summarized the basic principles a court must consider in evaluating whether soft tissue injury meets the statutory standards of *N.J.S.A.* 39:6A–8(a).

> In sum, a complaint alleging a permanent soft tissue injury survives a defense motion for summary judgment if plaintiff can raise a genuine and material factual dispute of these propositions: first, that the allegation of injury is based on credible, objective, medical evidence; second, that objective medical evidence supports the causal relationship between the injury and the disability alleged to have resulted therefrom; third, that the disability has the objective capacity to have a serious impact on the plaintiff's life; and fourth, that from the subjective point of view of plaintiff, the disability did have such a serious impact.
>
> [*Id.* at 39–40, 640 *A.*2d 1192 (citations omitted).]

Plaintiff claims that she submitted sufficient evidence of an injury by establishing the presence of muscle spasm. She cites *Owens v. Kessler*, 272 *N.J.Super.* 225, 639 *A.*2d 738 (App.Div. 1994), in which the court held that "persistent existence of spasm

raises a genuine issue of material fact sufficient to withstand summary judgment." *Id.* at 232, 639 *A.2d* 738. In that case, the court noted that muscle spasms were still evident twenty-six months after the cessation of medical treatment, clearly constituting "*prima facie* objective evidence of permanent injury." *Ibid.*

In this case, the record reveals that plaintiff exhibited muscle spasm in four of her five physical examinations, including her initial examination with Dr. Scardigli on June 1, 1993, and her last examination with Dr. Kahn on September 1, 1994. Notably, not one of plaintiff's doctors associated the muscle spasm, or any other condition resulting from the 1993 accident, with any sort of "permanent loss of use" or "permanent consequential limitation of use." *N.J.S.A.* 39:6A–8a; *Chalef v. Ryerson,* 277 *N.J.Super.* 22, 37, 648 *A.*2d 1139 (App.Div.1994). In fact, Dr. Cavallaro expressed in his examination report dated October 28, 1994, that plaintiff's condition "has improved slowly and consistently" and that the prognosis for her "attaining her pre-accident state of well being presently is fair."

Moreover, while we acknowledge plaintiff's deposition testimony in which she maintained that she still felt pain in her neck and back and, according to her, was incapable of taking part in various athletic activities, we note that the deposition was taken in October 1995. At that time, she admitted she had not been to a doctor for over a year. Indeed, at the time this case was dismissed, there had been no "credible, objective medical evidence" of her condition submitted to the court for over two and a half years. *Oswin v. Shaw,* 129 *N.J.* 290, 314, 318–19, 609 *A.2d* 415 (1992).

In light of these circumstances, we find that plaintiff has not satisfied the required showing of *persistent* muscle spasm as mandated by *Owens v. Kessler, supra,* and has thus failed to present objective, credible evidence of an injury sufficient to withstand summary judgment. 272 *N.J.Super.* at 232, 639 *A.*2d 738.

Affirmed in part, reversed in part and remanded.